# REPORTS OF CASES

DETERMINED IN

# THE SUPREME COURT

OF THE

## TERRITORY OF UTAH.

THE BULLION, BECK AND CHAMPION MINING
COMPANY, APPELLANT, v. THE EUREKA HILL
MINING COMPANY, JOHN Q. PACKARD AND
JOHN McCHRYSTAL, RESPONDENTS.

PLEADING—ACTION TO QUIET TITLE TO LODE—DESCRIPTION OF THE
LODE.—In an action to quiet title to a vein or lode it is sufficient
to describe such lode by its name, if the lot or mining claim in
which it has its apex is specifically described.

PLEADING—EQUITABLE CROSS-COMPLAINT IN ACTION OF TRESPASS ON
A MINING CLAIM—WHEN NO ADEQUATE REMEDY AT LAW.—In an
action instituted for the recovery of damages for alleged trespass
by defendants upon the *Bullion* lode; *held*, that a cross-com-
plaint filed by one of the defendants asking to have its title to the
*Eureka* lode quieted, and alleging that the plaintiff had set up
an adverse claim to 700 feet thereof, and was asserting the same
by the original action, sufficiently shows that the relief asked
therein affects the property to which the action relates; that the
cause of action set up in such cross-complaint is equitable and
that neither a defense to the original action nor an independent
action at law would afford such defendant complete and adequate
relief.

EVIDENCE—SUFFICIENCY OF.—The evidence reviewed; *held*, to be con-
flicting and sufficient to justify the decision.

VARIANCE—IMMATERIAL, WHEN.—A variance between the allegations
and the evidence, which ought not to have misled the appellant
to its prejudice, is no ground for reversal.

MINING CLAIMS—APEX WIDER THAN CLAIM—FIRST LOCATER TAKES
ENTIRE VEIN.—The first locator, having the ·apex of a vein en-
tirely within the surface lines of his claim for a portion of its
length, and for the remaining portion partly within and partly
without and within the surface lines of another claim, but never
entirely departing from such first location, owns the entire lode
within the end lines of his claim.

EVIDENCE—EXEMPLIFICATION OF PATENT—ADMISSIBLE IN EVIDENCE
EQUALLY WITH ORIGINAL.—An exemplification of a United States
patent for a mining claim, authenticated by the certificate of the ·
Commissioner. of the General Land Office and under the seal
thereof, is admissible in evidence equally with the original, and
without proof that the original is not in the possession or under
the control of the party producing the copy: Section 1178 of the
Code of Civil Procedure (Laws of Utah, 1884) held not to apply
to such an exemplification.

APPEAL from a judgment of the district court of the
first district, and from an order refusing a new trial.   The
opinion states the facts.

*Mr. Arthur Brown* and *Messrs. Sutherland & McBride*
(*Mr. P. H. Emerson, Mr. E. B. Critchlow, Messrs. Suther-
land & Son,* and *Mr. W. N. Dusenberry,* were with them
on the brief), for the appellant.

*I.   The cross-complaint does not state a case within
the statute relating to such complaints:* Laws 1884, p. 207,
sec. 305.

The plaintiff's action is trespass for damages, and for
an injunction to prevent a continuance of the wrong.   The
complaint charges that the defendants tortiously entered
upon and extracted ore from the *Bullion Mining Claim,*
the property of the plaintiff, which is described by metes
and bounds.

The defendant company, on the cross-complaint, alleges
ownership and possession of the Eureka Mining Claim,
which is also in that pleading described by metes and
bounds.   It alleges that the plaintiff has set up an ad-
verse claim to the north 700 feet of the lode, which is a
part of it.   The prayer is that the adverse claim be de-
clared void and its title quieted.

Our contention is that these causes of action have no re-
lation to each other.

1. The relief sought by the cross-complaint does not relate to or depend on the *"transaction"* upon which the plaintiff's action was brought.

That transaction was the alleged act of defendant in taking ore from the Bullion lode; the word transaction is used in the statute in its ordinary and popular sense: *Brewin* v. *Short,* 5 El. and Bl., 235; *Xenia Bank* v. *Lee,* 7 Abb. Pr., 372; *Richie* v. *Hayward,* 71 Mo., 560.

It is impossible to even conjecture any relation between the plaintiff's cause and the defendant's cross-cause of action on the point of the transaction other than that of retaliation; that the defendant committed waste on the plaintiff's lode, because the plaintiff set up an adverse claim to the defendant's lode.   That relation will not sustain the cross-complaint: *Barhyte* v. *Hughes,* 33 Barb., 320; *McDougall* v. *Maguire,* 35 Cal., 274.

2. The cross-complaint does not purport to affect the *"property"* to which the plaintiff's action relates.

That action relates to the property on which the alleged trespass was committed, and to the premises in respect to which the plaintiff asked and obtained protection by injunction.

The relief pleaded for by the defendant in its cross-complaint would, if granted, only quiet the defendant's title to and possession of a distinct non-conflicting adjoining parcel.   The facts stated in the two complaints are not inconsistent or contradictory.   Each party might obtain the full relief asked for, and execute its decree; and the execution of neither would detract at all from the benefit of the other's recovery.   The plaintiff's complaint charges a wrong done by defendants to one parcel, and the defendant company complains of a wrong done by plaintiff to another.

A cross-complaint being permitted only where the affirmative relief has the connection just discussed with the principal case, it is required to be defensive to the plaintiff's action, though it may ask further aid of the court: *Dietrich* v. *Koch,* 35 Wis., 618; *Leavenworth* v. *Packer,* 52 Barb., 132; *Pattison* v. *Richards,* 22 Id., 143; *Vassar* v. *Livingston,* 13 N. Y., 248; *National F. Ins. Co.* v. *McKay,* 21

Id., 19; *Stanley* v. *N. W. Life Ins. Co.*, 95 Ind., 262; *Mattoon* v. *Baker*, 24 How. Pr., 329; *Cross* v. *De Valle*, 1 Wall., 14; *Daniel* v. *Morrisons Ex.*, 6 Dana, 186; *Field* v. *Schiefflin*, 7 John. Ch., 250; *Royse* v. *Reynolds*, 10. Bush, 286.

This required relation is wanting; the cross-complaint alleges no defensive matter, nor does it seek affirmative relief relative to the Bullion claim or its vein.

The cross-complaint does not state a good, equitable cause of action.

The plaintiff, being in possession of the Bullion claim, brings trespass for the defendant's intrusion upon the lode therein, and obtains a provisional injunction to prevent a continuance of the wrong. The defendant, being in possession of the Eureka claim, where the defendant alleges it has a prior location on a part of the apex, claims to have possession of the entire lode, extending westward, so as to include all the ore-bearing ground in the Bullion; it charges the plaintiff with setting up an adverse claim to the Bullion part of the lode which it occupies; it denounces the plaintiff's working of the ore bodies there found as waste. On this statement, as the court construed it, the defendant asks to have its title to the Bullion part of the Eureka lode quieted, and the waste compensated and stopped. The plaintiff seeks damages for defendant's waste committed, and repose and security as to the remainder of the ground by injunction made perpetual. The defendant seeks repose and security by a quieted title, and damages for waste committed, by an accounting.

Had the plaintiff's action of trespass been tried, the defendant would have justified according to its answer. If the findings in this case are true, the works of defendant, stated in the fifth finding, would have been proved. To establish a justification, the defendant would have urged its title to the whole breadth of the lode, extending into the plaintiff's claim to the blue line. Instructions to the jury, in accordance with the conclusions of law in this case, would have made the justification successful. But if the whole ore ground claimed by defendant under the surface of the Bullion was not subject to the principles applied to

the particular ground where the alleged trespass was committed, if any part of that ore ground was so situated as to belong to the plaintiff, as part of the Bullion, the plaintiff would be entitled to have it protected under the complaint. A judgment on a trial of that case, whether for the plaintiff or defendant, would affect the whole subject of the cross-complaint as it was construed in the court below. Such a judgment, unreversed, would be *res judicata* to the same extent, and equally as effectual for relief, as would be a decree in the cross-suit; therefore our claim is:

1. The cross-suit was unnecessary.

A legal action affords an adequate remedy for the determination of legal rights. Courts of common law have and exercise a jurisdiction for the restitution of specific property claimed under legal title, and for the ascertainment of damages for the infraction of legal rights. In such cases, the legal remedy is adequate: 1 Story's Eq., section 616.

Equity does not interfere in those cases, except under well defined conditions, which show such cases to be exceptional on account of circumstances which prevent a resort to the usual common law actions. Replevin and ejectment are perfect means for the recovery of specific property by the legal owner; so are trespass and case for damages, whenever any legal right has been tortiously invaded. These legal remedies are adequate to both parties. A judgment in favor of a defendant fully protects him, according to the nature of his defense. If he did not do the act charged, a simple acquittal gives him all the assurance he needs that he will not again be vexed with the false clamor. If he justifies under title, a judgment in his favor conclusively establishes it so far as the plaintiff is concerned.

The adequacy of the legal remedy cannot be questioned merely because the judgment protects the parties only by way of estoppel: *Comstock* v. *Hanneberry*, 66 Ill., 212; *Doyle* v. *Franklin*, 40 Cal., 106, 116; *Wilson* v. *Madison*, 55 Id., 5; *Marshal* v. *Shaftter*, 32 Id., 176; *Pennoyer* v. *Allen*, 51 Wis., 360; *Gray* v. *Tyler*, 40 Id., 579; *Moyle* v. *Porter*, 51 Cal., 639.

If it were otherwise, a defendant in all cases, whether sued at law or in equity, might sustain a cross-complaint in order to have an affirmative judgment.

The defendant could obtain all the relief to which it was entitled to the extent of its pretensions, by answer to the plaintiff's complaint. By a successful defense, on an issue of title, the defendant would have an adequate remedy.

A judgment upon the merits of a cause in litigation, rendered by a court of competent jurisdiction, is a bar to all further prosecution of the same claim or demand: *Cromwell* v. *Sac*, 94 U. S., 351; *Demorest* v. *Darg*, 32 N. Y., 281; Bigelow on Estoppel, 37.

The bar will be available in any new case between the same parties or their privies, involving the same title, and depending on the same questions: *Aurora City* v. *West*, 7 Wall., 96; *Doty* v. *Brown*, 4 N. Y., 71; *Miller* v. *Maurice*, 6 Hill, 114.

A judgment in an action of trespass may decide conclusively a question of title: *Page* v. *Kennan*, 38 Wis., 320; *Aurora City* v. *West, supra; Outram* v. *Morewood*, 3 East, 346; *Burt* v. *Sternburgh*, 4 Cowen, 559; *Comstock* v. *Hennebery*, 66 Ill., 212.

In *Arnold* v. *Arnold*, 17 Pick, 9, the court says: "In *every* action the verdict is conclusive as to the *subject matter of the suit, and any matter particularly put in issue, and found by the jury*; and it will not be competent for a party in any other action to deny or plead anything to the contrary of what has been so found and adjudicated. Thus, if the demandant, in a writ of entry, has a judgment against him by the tenant, in a writ of trespass *quare clausum fregit*, upon an issue of soil and freehold, he cannot be permitted to say that at the time when the action of trespass was commenced the soil and freehold was not in the tenant."

It is an undeniable proposition, that, whatever the form of action, if the plaintiff or actor, must prove title to land, in order to recover, title is so in issue that if the plaintiff recovers, his title is conclusively established as against the defendant: and if he fails to recover, and judgment is rendered in favor of the defendant, on the merits, it is

conclusively established that title is not in the plaintiff. The latter judgment is equivalent to an affirmative judgment, that the title, at the commencement of the suit, was in the defendant, for the plaintiff is forever precluded from asserting the contrary.

Hence, we are entitled to say, that a judgment in the plaintiff's action, would be conclusive on the question of title; that, as between the parties, it would be determined as fully and beneficially as in ejectment, or the statutory action to quiet title. An opportunity was thus afforded for such an adjudication as in the sense of the law is an adequate remedy.

The defendant's claim extends to all the ore ground under the Bullion surface, of which the place of the alleged trespass is a part. The greater including the less, the parties respectively assert title to the whole. Under such an issue, the title, as broadly as it is in issue, will be res adjudicata in the judgment.

There are two cases directly in point which affirm this effect of the judgment. These cases are authoritative, because they have been cited and approved by the Supreme Court of the United States to support an analogous proposition in respect to a different cause of action. These are: Outram v. Morewood, 3 East, 346, and Burt v. Sternburgh, 4 Cow., 559.

See also Aurora City v. West, 7 Wall., 96; Gardner v. Buckbee, 3 Cow., 120; Bissill v. Kellogg, 60 Barb, 617, Bigelow Est., 110, note.

In Dunkel v. Wiley, 11 N. Y., 420, the plaintiff claimed title to a close, but the defendant did not take issue on that entire close; he specially pleaded that the part of said close mentioned in the declaration, and on which the trespasses are supposed to have been committed, were the close, soil and freehold of the defendant, and the verdict was limited in the same way; it was limited in express terms to the place where the trespass was committed. That place was in that case the unit of property, the title to which was in issue and determined.

In the case at bar, the plaintiff's title to the whole vein described is the same; it is the Bullion vein. The defend-

ant could controvert it as fully as it was alleged, and on that issue the title would be quieted. On that trial the title to the whole vein in the Bullion ground might have been finally determined.

The validity of a whole series of bonds was held in *Aurora City* v. *West*, to be determined in an action upon one; for though different bonds were described in the two declarations, yet the cases were precisely alike as to the right of the plaintiff; therefore, the first judgment was on the same subject matter. The court says:

"It cannot be successfully denied that the cause of action in the former suits was the same as that in the pending action, within the meaning of that requirement, as defined by decided cases of the highest authority." That learned court illustrates that proposition by citing, among others, as already pointed out, trespass cases.

There are two Wisconsin cases which are instructive upon this point. In *Gray* v. *Tyler*, 40 Wis., 579, a bill was filed to quiet title, and it failed because it was held that the plaintiff had an adequate remedy at law. A tenant of a person,.from whom both parties claimed, was in possession of a store on the premises, holding adversely to both parties, and against him an ejectment could be brought. It did not appear by the record whether the store covered the whole lot or not, but it was held that a suit against him would afford an opportunity to try the title to the lot; and that was deemed an adequate and exclusive remedy. The other case is *Page* v. *Kennan*, 38 Wis., 320, which was a like case, and met the same fate. One of the objections to entertaining the case as an equitable one was, that it was charged in the complaint, as it is in the cross-complaint here, that the defendant had trespassed on the land, and thereby an opportunity was afforded to bring a legal action, "to determine the question of title:" *Barron* v. *Robbins*, 22 Mich., 35.

There is another ground on which, beyond all question, it is proper to hold that the plaintiff's action embraced the title to the entire premises, which are claimed by the defendant and held by the court below to be in controversy in this cross action. The plaintiff, in that action,

claimed title to the whole mining claim, and, besides charging a trespass upon these premises as a unit, asked relief as to the whole, in the form of a perpetual injunction against threatened waste. The defendant, by its answer, justified the trespass, and opposed the injunction on the ground, not that the defendant owned the particular place where the alleged trespass had been committed, but on the ground that it owned the entire ore ground in question. There is a formal defect in the complaint, in not stating the equitable cause of action separately, but that defect was waived by failure to demur: L. 1884, p. 205, sec. 292, subd. 5, and sec. 293.

The complaint besides stating a legal cause of action for trespass, triable by jury, stated the same facts with others, as the basis of a prayer for equitable relief, touching the entire premises.

An unnecessary cross-complaint will be disregarded. It will not prevent any step in the original case, which the plaintiff therein would have a right to take, if no such cross-complaint had been filed: *Moyle* v. *Porter*, 51 Cal., 639.

As a cross-complaint is filed without leave of court the party filing it files it at his peril. If it states no cause of action, it may be demurred to: L. 1884, p. 207, but the objection is not waived by omission to demur: Id. p. 206, sec. 296.

If not germane to the plaintiff's case, in the way required by the statute, an objection will be good whenever any action is proposed upon it as an adjunct to the principal case.

2. The cross-complaint does not state a good equitable cross cause of action.

If it states no cause of action, no proof will entitle the defendant to a judgment for any relief. If it states a *legal* case, and it is brought to trial and judgment, against objection, as an *equity* case, without a jury, no judgment in favor of the defendant could be sustained. It would also be erroneous if the cross cause has not the statutory relation to the plaintiff's case.

The adjudication of legal titles, and legal rights generally, is the peculiar function of courts of law. Equity

does not assume to deal with such rights and titles, except incidentally, in the exercise of its peculiar jurisdiction in the administration of equitable remedies.

The distinction between legal and equitable actions can not be abolished, nor ignored, on account of the constitutional right of jury trial in the former. The right of such trial is absolute, when the right to be enforced is legal, and the usual legal remedy, which is always deemed adequate, is available: 1 Story's Eq., sec. 616.

It is not merely a right of such trial as a matter of practice, when a legal action must be tried, but a right which necessitates such an action: *Parsons* v. *Bedford*, 3 Pet., 233; *Ins. Co.* v. *Comstock*, 16 Wall., 258; *Lewis* v. *Cook*, 23 Id., 470; *Hipp* v. *Babin*, 19 How., 278; *Martin* v. *Zellerbach*, 38 Cal., 319; *Stevens* v. *Williams*, 5 Mor. M. R., 449; *Webster* v. *Reed*, 3 Pet., 437; *Treadway* v. *Wilder*, 12 Nev.. 108; *Stoncifer* v. *Yellow Jacket* 3 Id., 38; *Greason* v. *Keteltas*, 17 N. Y., 498; *Davis* v. *Morris*, 36 Id., 272; *Hudson* v. *Caryl*, 44 Id., 553; *Coleman* v. *Dix*, 50 Id., 572; *Haines App.*, 73 Pa. St., 171; *North Penn. Coal Co.* v. *Snowden*, 42 Id., 488; *Norris Appeal*, 64 Id., 275; *Tillmes* v. *Marsh*, 67 Id., 507; *Rasiers* v. *Van Dam*, 16 Iowa, 175; *Kleinschmidt* v. *Durphy*, 1 Mont., 118.

Ejectment is a perfect remedy to the legal owner of land out of possession, against another who is in possession, making an adverse claim: *King* v. *Carpenter*, 37 Mich., 266.

So, a party in possession has a right to object to any mode of trial to oust him in which he is denied a jury: *Tabor* v. *Cook*, 15 Mich., 322; *Stoncifer* v. *Yellow Jacket*, 3 Nev., 35.

Hence, we say, that as both parties claim the legal title, he who demands an adjudication is bound to submit the controversy to a court of law if he is able to do so. He has no election to take it into equity when there is no impediment in the way of the ordinary remedies at common law: 1 Story's Eq., sec. 616.

No such election can be claimed on a comparison of the methods of the two courts because a court of equity when

it takes jurisdiction pronounces a decree in more satisfactory form than is a judgment which a court of law renders in pursuing its usual and customary course. The remedy at law is exclusive, and it is deemed adequate, when by defense to a legal action already pending, or by one which the party desiring a decision can bring, he is able to procure an adjudication of the dispute. The form of the action is immaterial; it is enough that the action affords an opportunity to try the title, that after the trial it will be res *adjudicata.*

The issue in the principal case and that in the cross-suit as the latter was construed in the court below, required a trial of the same title—the legal title to the same piece of land. The cross-suit was ordered to be tried first as an equitable case without a jury. If so tried, and the judgment valid, the title as so determined would be *res adjudicata* in the subsequent trial of the trespass case. The legal title claimed on each side is cognizable at law; determining it in one case is no more an equitable proceeding than in any other. If the cross-complaint states an equitable case, it does not derive that character at all from requiring such a trial. A court of law is the appropriate tribunal for the trial of such a title. If it is tried in equity, it must be because the court of equity obtains jurisdiction for some other reason; then, for that reason, the case in which the title must be tried is an equitable case; the legal title is incidentally tried to establish some equity, or to give that equitable remedy for which the power of that court was invoked.

When a defendant in an action at law has an equitable right, it must be established by a decree before it is available at law as a defense, though it cover and answer the whole alleged cause of action. Therefore, when an equitable defense is pleaded, it must be set up as the basis of a counter claim, or cross-complaint. If it is germane to the case, so as to answer it in whole, or in part, if established, the settled practice is to try it first, for the same reason that a court of equity would stay by injunction the legal trial until the equitable case intended to countervail the legal right, asserted in the case at law, has

been determined: *Lestrade* v. *Barth*, 19 Cal., 670, 671; *Kimball* v. *McIntyre*, 3 Utah, 77; *Weber* v. *Marshall*, 19 Cal., 447.

It is not an analogy, but the identical proceeding. The court which has the law case before it has also the cross-cases; their relation is shown because the two cases are in the same record; the order of direction to try the equity cross-case first operates as an injunction to stay proceedings in the case at law. To determine whether a cross-case should be first tried it is only necessary to ascertain how a court of equity would act upon it if, on the statement of the cross-case in an original bill, a separate court of equity was asked to grant an injunction against the plaintiff in the case at law to stay the prosecution of his suit. If the matter proposed to be tried in the cross-case, and the relief asked, were within the competence of the court on the original case, whether affirmative relief be asked or not, the principal case would be tried with the cross-case, if at issue.

The cross-case at bar is not an equitable defence. It is a legal defence. It is one always available to a defendant in trespass *quare clausum*. It is the traditional defence of *liberum tenementum*. A cross-complaint to quiet title to the *locus in quo* is no more an equitable defence than it would be in an ejectment case.

It was directly declared in *Doyle* v. *Franklin*, 40 Cal., 110, not to be an equitable defence. In that case the court said also: "Where the defendant claims to be the owner, the issue is whether the plaintiff or defendant has the better title, and it seems reasonable to suppose that a judgment in favor of the former should be as conclusive upon title, and give the same measure of relief as to the latter; that its effect would be simply a bar in favor of either."

In *Comstock* v. *Henneberry*, 66 Ill., 212, the court refused to enjoin a suit of forcible entry and detainer on a bill to quiet title. It was said by the court: "The titles here are legal titles. A court of law is the proper tribunal to determine which of them is the best. It is only in extraordinary cases that a court of chancery will assume the trial of such titles." In another part of the same

opinion the court says: "We do not regard that there is any question of fraud in this case, or other circumstance that entitles the appellee to resort to a court of equity, instead of bringing his action of ejectment at law, and try-ing all questions between the parties in such a suit. A recov-ery in such an action, and a judgment that the appellee owned the premises in fee, would bar all the rights of the opposite party, and as effectually quiet appellee's title as a decree in equity."

It was assumed in the court below that an action to quiet title is necessarily an equity case, and also such, in a cross-complaint, as is required to be first tried.

We have no statute defining an equitable remedy of this nature. The Code of 1884 contains two sections on that subject. One is Section 620, which provides that: "An action may be brought by any person against another who claims an estate or interest in real property adverse to him, for the purpose of determining such adverse claim."

This section includes cases where ejectment might be brought: *Trittipo* v. *Morgan*, 99 Ind., 269.

In such cases, it could not be maintained that the court has power to try it as an equity case, and deny a jury. That it does include such a case is directly declared by the other section alluded to, which is Section 237 of the same code.

The distinction between common law actions and *quia timet* remedies in equity cannot be abolished while the constitutional right of jury trial in the former exists. It has been shown that, as there was an opportunity for the defendant to try the title at law, so far as adversely claimed, there was no ground for asking a *quia timet* remedy in equity. That remedy exists to set aside an ap-parent title or incumbrance which is invalid, and the holder of which is taking no steps to enforce it, and who is not occupying or meddling with the property, so as to subject himself to any legal action. The statute does not, and could not, abridge the right of trial by jury. Under it, courts of equity do not assume jurisdiction to try legal titles when a trial at law is within reach of a party desiring an adjudication. Mr. Pomeroy has clearly stated the true

criterion of equity jurisdiction. He says: "Whether or not the jurisdiction will be exercised, depends upon the fact that the estate or interest to be protected is equitable in its nature, or that the remedies at law are inadequate, where the estate or interest is legal—a party being left to his legal remedy where his estate or interest is legal, and full and complete justice can be done;" 3 Pom. Eq., section 1399 and note; see *Goldberg* v. *Taylor*, 2 Utah, 491.

There is nothing inconsistent with this view in *Holland* v. *Challen*, 110 U. S., 15. The statute of Nebraska, under which the complaint was filed, was substantially like the statute of this territory. It was held to authorize a bill in equity where the land was vacant. It was then a bill *quia timet.*

The land was unoccupied in that case. The court say:

"The property in this case, to quiet the title to which the present suit is brought, is described in the bill as unoccupied, wild and uncultivated land. . . . An action for ejectment would not lie, as it has no occupant, and if, as contended by the defendant, no relief can be had in equity, because the party claiming ownership is not in possession, the land must continue in its unimproved condition. . . . To meet cases of this character, statutes, like the one of Nebraska, have been passed by several states, and they accomplish a most useful purpose." The opinion all through is careful to maintain the jurisdiction in equity of cases under that statute only where legal actions cannot be resorted to for the determination of the title.

In *Alton Marine & Fire Insurance Company* v. *Buckmaster*, 13 Ill., 201, the court said: "The reason why a party out of possession cannot maintain such a bill is, that he may bring an action at law to test his title, which, ordinarily, a party in possession can not do. Such a bill is only entertained by a court of equity, because the party is not in a position to force the holder of, or one claiming to defend under the adverse title, into a court of law, to contest its validity; and this as a general rule, is the *test* to which a court of equity will look

to determine whether the necessity of the cases requires its interference."

In *Stockton* v. *Williams,* Walk. Ch., 120, the bill was to quiet title, and was filed by the defendant in an ejectment suit for the same land. The defendants in equity insisted for the first time at the hearing on pleadings and proofs that inasmuch as they had brought an action of ejectment for the purpose of trying their title at law before the complainants filed their bill in equity, the bill should be dismissed for want of jurisdiction under the statute, which they contended should be construed to apply to claims only which the party was not proceeding to establish at law, at the time of filing the bill. The Chancellor said:

"The object of the statute seems to be to enable a person in possession of real estate, and having a title thereto, to remove all doubts in regard to his title arising from the claims of third persons who are taking no steps to test the validity of their claim at law or equity, and who, by their refusal or neglect to institute proceedings for that purpose keep the party in possession in a state of suspense. This is the extent, I think, to which this court should go under the statute. A different construction of the act would leave it optional with every defendant in ejectment to litigate his title either at law or in this court, and by filing his bill here, to take from his adversary the right to have the facts of the case passed upon by a jury of the country. Such, therefore, it seems to me, is the construction that should be given to the statute, where the title of the defendant in ejectment is a legal and not an equitable title, and there is nothing to prevent his establishing it as fully at law as in a court of equity:" S. C., 1 Dong., 546.

In *Moran* v. *Palmer,* 13 Mich.. 367, an ejectment suit had been brought against a tenant; the landlord assumed the burden of defense. One trial had taken place and a verdict recovered by the plaintiff; another trial could be had, of course, on payment of costs. In this state of the proceedings, the landlord filed a bill against the persons who were plaintiffs in ejectment to quiet his title. The

proceedings in the ejectment suit were stated in the answer. The court say, by Cooley, J.:

"We have thus presented to us the anomaly of a party who asserts that he is possessed of a complete legal title to lands which are occupied by him, and who points out no difficulty in the way of exhibiting and establishing such title, appealing to a court of equity for relief against the claims of other parties who are pressing their claims against him at law, and have already obtained an adjudication in their favor. Argument to show that this bill cannot be sustained is entirely unnecessary. If the facts as above stated were fully set forth in the bill, it would be demurrable, and being presented by way of defense, they are a complete answer to complainant's case. A court of law is the appropriate tribunal for the trial of titles to land: *Abbott* v. *Allen*, 2 John. Ch., 520; *Devaux* v. *The City of Detroit*, Harr. Ch., 98. The claimant of the legal title has a right to have the facts upon which his claim is based submitted to a jury, and it is only when the remedy at law is inadequate that resort can be had to equity. Nothing is better settled than that equity will not aid in clearing a title to land when complainant's remedy at law is complete: *Alton Marine & Ins. Co.* v. *Buckmaster*, 13 Ill., 201; *Smith* v. *McConnel*, 17 Ill., 138; *Ritchie* v. *Dorland*, 6 Cal., 33; *Walcott* v. *Robbins*, 26 Conn., 236; *Munson* v. *Munson*, 28 Conn., 582; *Shotwell* v. *Lawson*, 30 Miss., 27; *Murphy* v. *Blair*, 12 Ind., 184. And when a party comes into equity for relief, he must set forth in his bill the circumstances which deprive him of a legal remedy: *Williams* v. *Ayrautt*, 31 Barb., 364. A bill to quiet title on behalf of the legal owner is only entertained where the party is not in a position to force the adverse claimant into a court of law to test its validity: *Alton Marine & Fire Insurance Company* v. *Buckmaster*, 13 Ill., 201. This happens when the holder of the legal title is in possession and an adverse claim is set up, which no steps are taken to enforce; but when each party claims the legal title, and the court of law is already possessed of the case, and it is not alleged that either fraud, accident or mistake has intervened to prevent the possessor establish-

ing at law all the title which he claims, the remedy at law is perfect, and equity cannot interfere to take from a jury the trial of the questions, which, in such a case, belong to that tribunal. The more clearly the complainant establishes his title under such circumstances, the more clearly does he show that the relief he seeks is not within the province of a court of equity:" *Page* v. *Montgomery*, 46 Mich., 51; *Comstock* v. *Henneberry*, 66 Ill., 202.

3. The cross-complaint does not sufficiently allege the adverse claim, and the demurrer was erroneously overruled.

The statement of it is a legal conclusion, and fatally defective: *Wals* v. *Grosvenor*, 31 Wis., 684; *Page* v. *Kennan*, 38 Id., 324; *Peters* v. *Hansen*, 21 N. W. Rep., 342; *Jenks* v. *Hathaway*, 48 Mich., 536; *Blasdal* v. *Williams*, 9 Nev., 161; *Hibernian etc. Co.* v. *Ordway*, 38 Cal., 679; *Teal* v. *Collins*, 9 Oregon, 89.

The certified or exemplified copy of the record of the patent from the United States to the Eureka Mining Company of Utah, of the Eureka mining claim, which was the source of the respondent's title, and through which they proposed to derive title, was improperly admitted in evidence, because it was not shown that the original was not in the possession of the party offering the certified copy of the record, nor was it in any manner accounted for.

We may concede that by the common law rules of evidence, a patent under the seal of the United States, is conclusive proof of the act of granting by its authority, and its exemplification is a record of absolute verity in all states and territories where this rule has not been changed by statute: *Patterson* v. *Winn*, 5 Peters, 233.

If this rule, as a common law rule, was ever in force in this territory, it has been changed and abrogated by the positive enactment of the Legislature: Code of Civil Procedure, sec. 1198.

This provision the code applies to a patent from the Government with equal force and binding effect as to a grant from a private individual.

The exemplified copy of the record of the patent received in evidence, was secondary evidence of an instrument conveying real estate, and to authorize a certified

copy of the record of such an instrument to be read in evidence, it should have first been shown that the original was not under the control of the party offering this evidence, or have been in some way legally accounted for: Code of Civil Procedure, sec. 1198; *Mayo* v. *Mageany*, 38 Cal., 442; *Stephenson* v. *Dol*, 8 Black, 508.

Whatever inconvenience such a practice or construction would work, still it is better to remit parties to original proof where the requisites of the statutes have not been complied with: *Ruslim* v. *Shields*, 11 Ga., 636.

4. *The defendant failed to prove the descriptive allegations in the cross-complaint as to the locus in quo.*

It is a more serious objection than a variance—it is failure to prove "the allegation of the claim," "not in some particular, or particulars, only, but in its general scope and meaning:" Utah Code Laws, 1884, sec. 342.

The complaint is not filed to quiet title to a definite parcel of surface land, but to a mineral vein described under peculiar conditions. These premises have been already referred to, with a view to showing a variance of another sort. The vein is described as *dipping westerly, as running parallel with the Eureka claim, and its course and apex inside its surface lines for its whole length, except at one point for a short distance.* The northerly 700 feet of this vein is the part alleged to be adversely claimed by plaintiff.

The cross-complaint admits a slight variation of the hanging wall at one point for a short distance. This is said, by way of exception to the general averment, that it ran within and parallel to the side lines the whole length of the claim—2200 feet; it is not alleged that this variation occurs in that space of the vein adversely claimed by the plaintiff; nor is the adverse claim stated to be of so much of the vein as by this swell lies within the Bullion lines. The adverse claim is stated to be of the vein entire for 700 feet, and the northerly 700 feet of the vein in the Eureka claim.

It is evident that the pleader intended to base the defendant's title to the vein on the fact that the entire apex was within the side lines of the claim, and while a varia-

tion for accuracy was stated, it was averred to be a *slight variation,* that it was for a *short distance,* implying that wherever it occurred it was a trifle not to be regarded.

What is thus averred as to the situation, size, form and course of the vein at the apex and downwards, is important; they signify the quality of the title, the nature of the adverse right, and alone identify the premises; they are matters of essential description. Issue is joined on these averments. The denials are circumstantial and extend to all the descriptive details. Hence the defendant was bound to prove strictly and literally its title to the premises as so described in the cross-complaint. These details alleged constitute and distinguish the defendant's claim. Other premises, in whole or the part, would make a different case, and the right thereto would not be the same: 1 Greenleaf Ev., secs. 56, 58, 60, and note 3; 64; 2 Id., sec. 618 a; *Hill* v. *Haskins,* 8 Pick., 83; *Emerson* v. *Wiley,* 7 Id., 64; *Walton* v. *Mace,* 2 B. & Ad., 756; *McConnell* v. *Kibben,* 33 Ill., 175; *Baxter* v. *Knox,* 19 Id., 267.

5. The judgment was not warranted by the findings.

*a.* A patent conveys only what lies under the patented surface, except on the dip of a vein departing from a perpendicular.

The scheme of the federal land laws is to divide all the public lands into parcels, with divisional lines which make each parcel abut immediately upon another on every side. These divisional lines are actual lines. They are marked on the ground, or substantially so. The parcels are all officially surveyed and platted, and the plats are preserved as a permanent memorial of the divisions, in the land office.

Certain classes of lands are in market prior to the extension to them of the general system of the public surveys; but, in such cases, without exception, the parcel authorized to be sold, when applied for, has to be officially surveyed and platted, before it is granted by patent.

The lines established on the public lands are lines of division, according to the common law. In other words, when a patent conveys a parcel, it is granted to its boundaries. It is bounded on all sides by vertical planes. The

grantee thereby acquires title within these planes, to all the space above, and to the centre of the earth below. He gets no title to anything beyond these planes, unless by special provision of the grant.

The restriction to boundary lines is not a novel feature, peculiar to our public land system. It has always been fundamental in private as well as public grants. With one familiar exception it is absolute in respect to side lines, and end lines, of mining claims. The principle was applied in the Flagstaff case. It was recognized, also, in the following cases: *Lebanon M. Co.* v. *Rogers*, 5 W. Coast Rep., 310; *Wolfley* v. *Lebanon M. Co.*, 4 Colo., 112; *Stevens* v. *Williams*, 1 McCrary, 480; *Pallard* v. *Shively*, 5 Colo., 309.

It is upon this principle that it is presumed that he who owns the surface, owns all the minerals under it. The right of a mine owner to pursue his vein downwards through his side lines under the surface of his neighbor, is exceptional. He can never justify himself in doing so, nor enjoin that neighbor from working there, without proving the connection between the ore in the adjacent premises and an apex inside the limits of his claim; he must show affirmatively that ore in his neighbor's ground is part of a vein, the apex of which he owns. The burden of proof is on him, to show the facts from which this lateral right proceeds. Hence, as a corollary, there is, in the absence of such proof, a presumption that the owner of the surface is the owner of all the ore and other valuable substances under it: *Stevens* v. *Gill*, 1 Morrison, M. R., 576, 581; *Leadville M. Co.* v. *Fitzgerald*, 4 Id., 380, 383; *Iron Silver M. Co.* v. *Cheeseman*, 2 McCrary, 191; S. C. Affirmed, 116 U. S., 529.

The apex of a vein represents surface. It may not be the literal surface, the topmost layer of the substance of which his purchase consists, and which his feet touch when he walks over it. Each layer or stratum of soil or rock below, represents area in his purchase as much as the first, for patents are not grants of mere superficies.

The width of the supposed broad vein represents area which cannot be acquired in fee from the Government with-

out purchase according to its acreage. This is the primal condition of all grants upon sales. Whether a lode apexes on the surface or at any distance below, it has to be sold by some measure of surface ground which includes it.

The act of 1866 intended that the locators of a vein should obtain a patent for it entire between the end lines of their claim. It was, however, a passive intention; the claimant had to comply with conditions. The act contained no grant of any part of a vein to a discover or locator; it merely pointed out to him he could get a patent for it, and it defined the effect of the patent. The important condition was, that an application for surface area, including the vein, should be made, and the acreage of it paid for. It would be contrary to the intention of Congress that any person get title to a mineral bearing vein, or any part of it, without payment at the statutory rate per acre. The intention is, that the claimant have title by doing the acts prescribed in the law. It needs no argument to show that when a statute confers a benefit upon certain conditions being complied with, that benefit can only be acquired by performance of the conditions. If the claimant does not perform the conditions he must abide the consequences which invariably result in general to parties claiming statutory rights without performing the precedent statutory conditions.

Let us briefly consider these conditions. What was required by the act of 1866? What was required of the Eureka Company had it seen fit to apply for a patent under the law which was in force when the location was made? The second section of that act provides: "That whenever any person, or association of persons, claim a vein or lode of quartz or other rock in place bearing gold, silver, cinnabar or copper . . . it shall and may be lawful for such claimant or association of claimants to file in the local land office *a diagram of the same*, so extended, laterally or otherwise, as to conform to the local laws, customs and rules of miners, and enter such tract and receive a patent therefor, granting such mine, together with the right to follow such vein with its dips, angles

and variations to any depth, although it may enter the land adjoining, which land adjoining shall be sold subject to this condition."

It will be observed here that the diagram is to include the vein, so extended, laterally or otherwise, as to conform to the local laws in respect to surface for working purposes; that he is to enter *such tract*; that the patent shall grant *such mine*, together with the right to follow the vein.

The third section prescribes the routine of the entry. It includes the payment of $5 per acre for the land in "such tract," or "such mine." (These are equivalent expressions in section two).

If the Eureka vein is a broad one; if the apex is so wide that the Montana, Eureka and Bullion, which are parallel claims, have room on it, and extends over farther east and west, then the application for it and the diagram of it, representing the tract or vein which is actually embraced in the Eureka patent, is not a compliance with that statute. The applicant did not ask for a patent of such a tract as this supposed broad vein, nor did the applicant pay five dollars per acre for such a tract. Hence, if the rights under the patents were to be tested by the intention of Congress as expressed in the act of 1866, the tract now claimed to constitute that vein was not acquired. The condition of making a diagram of it, the condition of paying for it, the condition of giving the required notice to adverse claimants, was not performed.

The act of 1872 continued the rights of locators in claims theretofore located. It prescribed a somewhat different routine of entry, but it was substantially the same; a plat has to be made of the claim, a notice published for the benefit of adverse claimants, and the same price per acre paid: R. S. U. S., sec. 2325.

What the claim includes for which a patent may be so obtained is defined in section 2322. The claimant has "the exclusive right of possession and enjoyment of all the *surface included within the lines* of the location, and of all the veins, lodes, and ledges, throughout their entire depth, the top or apex of which lies *inside* of such surface

lines, extended down *vertically*, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations."

The act of 1866 contemplates a conveyance of only one vein, but it requires that vein, for the linear feet located, to be included in the diagram, as the tract to be paid for and patented.

The act of 1872 requires the same tract to be platted and paid for; and the patent grants the tract in fee, with all the other veins, the top or apex of which lies *inside* the surface lines.

Under both acts, the tract is to be officially surveyed and marked on the ground; the vein entire between the end lines was required to be included and paid for; and both acts provide for connecting the public surveys with the parcels sold as mining claims: R. S., U. S., section 2327; C. L., Utah, p. 67.

The omission of the applicant for the Eureka patent was not merely technical. It consisted in leaving out of its diagram and application the extra-lateral premises now claimed; by leaving them out they did not pay for them. The applicant was required to include them, if, as now found, they were part of the apex of the vein. Had the applicant included them, payment would have been for them, and the patent lines would have included them.

By leaving them out of the diagram on the application, they were left to be embraced in an adjacent parcel. By being so left, they remained a part of the public domain, and subject to exploration and appropriation by any other person qualified to locate a mining claim. Hence it appears, on the defendant's showing, that it is claiming land it has not paid for, and, under the law, without having performed the statutory conditions.

The plaintiff acquired the adjoining parcel by including this extra-lateral parcel in its survey and application, and by paying the government for it. It was granted in fee, by patent, to the plaintiff, because at the time it was vacant and unappropriated public land.

If the defendant's grantors had a prior location which

entitled it to claim the entire vein between the Eureka end
lines, the patent applied for by that name exhausted the
locator's rights as such. The defendant accordingly claims
solely as successor of the patentee, and can claim under its
conveyances no more than was granted by the patent. The
location claim was merged in the patent. What was orig-
inally in the location, and not embraced in the application
for patent, was relinquished—abandoned—restored to the
public domain.

What is the extra lateral right granted by the mining
laws? The statute grants a conditional use in perpetuity,
and on a purchase, a patent in fee; each confers *an ex-
clusive right of possession of all the surface included
within the location or patent lines*, and *"enjoyment of all
veins, lodes and ledges throughout their entire depth,
the top or apex of which lies inside of such surface
lines extended down vertically, although such veins, lodes
or ledges may so far depart from a perpendicular in
their course downward as to extend outside the vertical
side lines."*

Under this provision, side lines or planes are vertical
down to the apex of any vein or veins within the surface
lines. The claim owner has exclusive enjoyment of all
veins, lodes and ledges, the *top or apex of which lies inside
of such surface lines*, whatever may be the angle of de-
parture from a perpendicular in their course downward.
This assurance applied to the applicant for the Eureka
patent in respect to the supposed broad vein, and by
treating the vein as inside the surface lines, when in-
cluded therein, as the law required the application and
survey for a patent to include them. When an import-
ant longitudinal part is left out, and not paid for nor
patented, the patentee pays a reduced sum for reduced
ground, and he will not be heard to claim that he has pur-
chased what he has left out, that the less includes the
greater; in such a case he cannot claim the apex is inside
his patented lines. The whole area of the apex was re-
quired to be embraced in the application, that the whole
might be paid for and granted. Only a part was included,
paid for and granted. We say that the benefit accorded to

the purchaser of the *whole* is not promised to, and can not be claimed by him, who merely takes a *part.* It would be contrary to all the analogies of the law. The lateral right is assured only to the owner of the entirety.

The universal rule, with the exception here allowed is, that grants of land are bounded by vertical planes. This exception is by special statute in derogation of the common law rule. It must, therefore, be construed strictly: *Dwelly* v. *Dwelly,* 46 Me., 377; *Burnside* v. *Whitney,* 21 N. Y., 148; *Taylor* v. *Mayor & Co.,* 82 Id., 19; *Smith* v. *Moffat,* 1 Barb., 67; *Eslerby's App.,* 54 Pa., St., 194; *Wales* v. *Lyon,* 2 Mich., 282; *Brown* v. *Fifield,* 4 Id., 322; *Thompson* v. *Weller,* 85 Ill., 197; 1 Kent's Com., 464.

If a whole vein goes to the grantee of a part, how small may that part be? Since experts are getting so astute as to discover broad veins in heterogeneous zones, it may become important to the public interest to ascertain to how small a surveyed and patented parcel a whole mining district may be annexed by liberal intendment.

This supposed broad vein is not *inside* the surface lines, nor is the lateral parcel in question the vein on the dip departing from a perpendicular in its course downward. According to the findings, this parcel has its easterly boundary just inside the Eureka claim. Hence, the apex of the broad vein, as a whole, is inside the Eureka claim about as a horseback rider is inside of the horse. Is a man inside of a field while he straddles the fence on one side of it? We do not need to invoke a rule of strict construction to insure the conclusion that this supposed broad vein is not inside the Eureka surface lines. If it is, why call the right to it an extra-lateral right? According to the findings, this parcel is lateral apex, not inside apex. The statute giving the only lateral right which exists, does not apply to it, and therefore, the otherwise universal rule of vertical boundary planes, and that grants are limited to the granted premises, must govern. Any case which in express terms gives a grantee a parcel beyond his boundaries, introduces a startling innovation, which violates fundamental principles. Such an adjudication takes the property of one man and gives it to another, contrary to "the

law of the land." The judgment in this case works just that injustice. The parcel being outside of the patent lines, it is absurd to say the words of grant apply to it. In decreeing it to the owner of the adjacent land, the judgment takes from the plaintiff its land "without due process of law."

In the Equator case, referred to by Dr. Raymond in the "Law of Apex," Mr. Justice Miller, of the Supreme Court of the United States, sitting at the Circuit in Colorado, and Judge Hallett, have affirmed the views here advanced: That where the boundary line of a mining claim runs along the apex of a vein, and does not include the whole apex, it is, as a boundary, a vertical plane. The same is declared again by Mr. Justice Miller, in *Stevens* v. *Williams*, 1 McCrary, 491 In charging the jury he said:

"The plaintiff is not bound to lay his side lines perfectly parallel with the course or strike of the lode, so as to cover it exactly. His location may be made one way or the other, and it may so run that he crosses it the other way. In such an event, his end lines become his side lines and he can only pursue it to his side lines which vertically extend as though they were his end lines; but if he happens to strike out diagonally as far as his side lines include the apex, so far he can pursue it laterally; if the vein projects beyond his side lines, then it is only a question as to the distance which he can include this vein in his side lines."

It is supposed by the defendant that *Rose* v. *Richmond Mining Company*, (17 Nev., 25; S. C., 114 U. S., 576), decides the question the other way. That question was not in the case. The parties agreed to that conclusion, and the questions which were decided, needed that concession to make them pertinent. Neither the court in Nevada, nor the Supreme Court of the United States, was asked to decide that point; and no opinion in regard to it was intimated.

In the case of *O'Reilly* v. *Campbell*, 116 U. S., 418, Judge Field, delivering the opinion of the court, said:

"It is true the locators of the Omaha claim *intended* to take the vein or lode, and were ignorant of its true di-

rection. *But it was incumbent upon them to make explorations and ascertain its true course, and indicate it in some public and visible manner,* so that others might not be excluded from explorations on adjacent ground, or be deprived of the benefit of their labor."

"Ordinary surface explorations" have no merit. It is the duty of the locator to find which way his vein runs and locate on it, on pain of losing it, if another explores and locates it in ground he first has excluded from his claim by the manner in which he gives "public and visible indication of it.

In the Flagstaff case the same doctrine was announced in determining the effect of a patent. In *Elgin M. & S. Co. v. Iron S. M. Co.,* 4 McCrary, 284, 285, the court say: "It is contended that in the location of a claim, which must, of necessity, be made before the strike of the lode can be ascertained, it is too much to expect the locator to lay his end lines in the proper direction; and locations at various angles of divergence from the strike of the lode, are cited to illustrate the fact that by a slight deviation from the proper course. the object of making a location may be defeated. This, however, is only to say that it is difficult to make a good location of a mining claim when the situation of the ore is unknown, and that if the locator fails to lay his claim so as to secure the ore, the law should correct his mistake. Plainly enough the law requires the locator to fix the boundaries of the claim, offering the bounty of the government to the extent of the public domain from which to make the best possible selection. If the locator fails to choose wisely and well, the failure is with him, and it cannot be imputed to the law.

"Under such a statute (i. e., one requiring boundaries to be marked on the ground) it cannot be necessary to discuss at length the power of the court to establish lines by construction, for no such power can exist."

As to losses from incorrectly laying boundary lines of a mining claim the court repeats: "It presents the common case of failure to obtain property through a mistake of fact or law, for which the party seeking the property is

alone responsible.    Against such error and misfortune the law does not relieve."

In *Golden Fleece Co.* v. *Cable Con. Co.*, 12 Nev., 329; the court say: "Under that law (Mining Act, May 10, 1872) it can not be doubted that it (the plaintiff) is bound by the lines of its surface claim in favor of a subsequent locator. It is true that the vein is the principal thing, and the surface is but an incident thereto; but it is also true that the mining law has provided no means of locating a vein except by defining a surface claim, including the croppings, or point at which the vein is exposed; and the part of the vein located is determined by reference to the lines of the surface claim. Those lines are fixed by the monuments on the ground, and they cannot be changed so as to interfere with other claims subsequently located."

*b.*—The plaintiff's application for the Bullion claim included this lateral parcel, and the defendant company is estopped by the patent.

That parcel was then, for the first time, applied for; it was, and is, included in the Bullion claim, according to the very language of Sec. 2352, U. S. R. S. The plaintiff had the exclusive right of possession and enjoyment of all the surface within the lines of their location and of this lode, the top or apex of which lies inside of those lines extended downward vertically. The defendant had not before asserted title to it, so as to be exempted from contest.

Its patent was not an estoppel. The plaintiff's patent is an estoppel: *Eureka Case*, 4 Sawyer, 318; *Wright* v. *Dubois*, 21 Fed. Rep., 693; *Richmond M. Co.* v. *Rose*, 114 U. S., 584.

This is not an estoppel which has to be pleaded; a patent is inherently masterful to convey; it imports that no adverse surface claims exist. It estops just as a written contract estops the parties from parol proof.

*Messrs. Bennett, Harkness & Kirkpatrick*, and *Messrs. Dickson & Varian*, for the respondent.

It is contended by appellant that it does not appear from the cross-complaint herein that the affirmative relief therein sought relates to or affects the property to which the action relates.

In considering this objection it will be borne in mind that no demurrer was interposed on the ground of uncertainty or ambiguity.

It may be conceded that defendant's cross-complaint was not drawn with the precision that it might have been. Nevertheless, in the absence of a special demurrer, if it can be ascertained therefrom that the relief therein sought affects the property to which the action relates, it is sufficient, no matter how defective or argumentative the allegation.

Now it is alleged in the cross-complaint that plaintiff asserts an adverse claim to the property therein described; and it further alleges how the assertion is made, namely: "By the bringing of this action." *This allegation is admitted by the general demurrer.* Now plaintiff's action is brought to recover damages for an alleged trespass by defendant on the property described in plaintiff's complaint. The bringing of such action could not be an assertion of an adverse claim to the property described in the cross-complaint unless the property described in the latter was the same as that described in plaintiff's complaint.

Uncertainty, ambiguity or any other defect in the manner or form of the allegation is waived by a failure to demur specially. Such is the express provision of the statute. And the rule always was that all•defects in the form of the allegation—for instance that it was not sufficiently direct and express—were cured by verdict: *Garver* v. *Marshall,* 9 Cal., 269; *Happe* v. *Stout,* 2 Cal., 460; *Garcia* v. *Satenstegin,* 4 Cal., 244; *People* v. *Raines,* 23 Cal., 127.

A party in possession of real estate (or if the same be vacant) claiming to own the same or some interest therein, whether the title on which he relies be legal or equitable, may file his bill to have his title quieted whenever another claims an estate or interest therein adverse to him. He

is no longer required to delay seeking the aid of a court
of equity to quiet his title until he has been disturbed by
the institution of an action against him and until judgment therein has passed in his favor.

To this extent right to equitable relief has been carried
by the statute: See Laws 1884, p. 271, sec. 620, p. 194, sec.
237.

Neither can there be any doubt as to the validity of
such legislation.

Whether the legislature intended to carry the remedy
still farther, (as it has been in Indiana, Iowa and perhaps
some other states; *Green* v. *Glynn,* and *Rose* v. *Nees,* 61
Ind., 336, 484; *Lewis* v. *Soule,* 52 Iowa, 11; *Lees* v.
*Wetmore,* 58 Iowa, 170), and to permit one out of possession to maintain his bill against one in possession; and
if so, whether such legislation would be in conflict with
the constitution, are questions, we submit, which do not
arise in this case and need not therefore be considered.

*Curtis* v. *Sutler,* 15 Cal., 260, was an action to quiet
title brought under the statute of that state which provided: "An action may be brought by any person in possession by himself or his tenant, of real property, against
any person who claims an estate or interest therein adverse
to him for the purpose of determining such adverse claim,
estate or interest."

Judge Field, speaking for the court, says: "This statute
enlarges the class of cases in which equitable relief could
formerly be sought in the quieting of title. It authorizes
interposition of equity in cases where previously bills of
peace would not lie." After discussing the former jurisdiction of the courts of chancery and showing in what
cases bills of peace would lie, he proceeds: "Under the
statute of this state it is unnecessary for the plaintiff to
delay seeking the equitable interposition of the court, until he has been disturbed in his possession by the institution of a suit against him, and until judgment in such
suit has passed in his favor. It is sufficient if, whilst in
possession of the property, a party out of possession
claims an estate or interest adverse to him. He can immediately, upon knowledge of the assertion of such claim,

require the nature and character of the adverse estate or interest to be produced, exposed and judicially determined, and the question of title be thus forever quieted."

The following cases are to the same effect: *C. P. Ry. Co.* v. *Dyer*, 1 Sawyer, 641; *Leggett et al.* v. *Cole*, 1 McCrary, 515; *Holland* v. *Challen*, 110 U. S., 15; *Collins* v. *Mc-Duffer*, 89 Ind., 562, *Low* v. *Blackburn*, 2 Nev., 70; *Reynolds* v. *Crawfordsville Bank*, 112 U. S., 405; Pom. Eq. Jur. Vol. 3, Secs. 1396-7 and notes.

The action to quiet title under statutes like that we are considering have been uniformly treated as equitable in their nature: *Curtis* v. *Sutter*, 15 Cal., 259; *C. P. Ry. Co.* v. *Dyer*, 1 Saw., 641; *Holland* v. *Challen*, 110 U. S., 15; *Reynolds* v. *Bank*, 112 U. S., 405; *Balemaer* v. *Otis*, 4 Dill., 558; *Leggett* v. *Cole*, 1 McCrary, 515; *Massir* v. *Stradford*, 17 Ohio St., 597; *Brandt* v. *Wheaton*, 52 Cal., 430; *Low* v. *Blackburn*, 2 Nev., 70; *Richardson* v. *Smith*, 2 Utah, 425.

The regular and proper practice is to dispose of the equitable branch of the case first: *Estrada* v. *Murphy*, 19 Cal., 248; *Lestrade* v. *Barth*, 19 Cal., 660; *Weber* v. *Marshall*, 19 Cal., 447; *Bodley* v. *Ferguson*, 30 Cal., 512; *Martin* v. *Zellerbach*, 38 Cal., 300; *Low* v. *Crown Point Mg. Co.*, 2 Nev., 75; *Whittier* v. *Stage*, 61 Cal., 238; *Kimball* v. *McIntyre*, 3 Utah, 77; *Dobbs* v. *Kellogg*, 53 Wis., 448; *Massir* v. *Stradford*, 17 Ohio St., 597.

But it is urged by appellant that defendant was not in a position to ask the equitable relief sought in its cross-complaint, because as appellant contends, it had a complete and adequate remedy at law; first, by way of defense to the action of trespass brought by plaintiff; and secondly, in the action of trespass which, as appears from the allegations of the cross-complaint itself, defendant might have instituted against plaintiff.

Neither action, we say, afforded defendant complete and adequate relief—in neither action would defendant obtain the relief to which the statute entitled it.

Under the statute the owner of real property being in possession, is entitled, whenever another out of possession

makes an adverse claim of any estate or interest therein, to have the question of such asserted claim at once adjudicated and forever disposed of and the question of his title set at rest. In such case the decree becomes matter of record in enduring form, and if in his favor it ever after constitutes a muniment of his title. This is the measure of the relief to which he is entitled under the statute; it is manifest that he cannot obtain it, either as plaintiff or defendant, in an action of trespass.

The question of title is not necessarily involved in such action—the right of the plaintiff therein to recover depends upon his possession as against the mere trespasser. And should the plaintiff in his complaint allege that he was the owner in fee simple absolute and deraign title to the premises by deed or other matter of record, and fail to prove or offer to prove the title so set out, yet as against the mere trespasser he would be entitled to recover upon proof of his possession merely.

In *McCarson* v. *O'Connell*, 7 Cal., 152, it is said: "Possession is sufficient to enable the plaintiff to maintain trespass, and although a higher title may be attempted to be set up, the failure to sustain it will not defeat the right to recover damages."

See also: *Parker et al.* v. *Hotchkiss*, 25 Conn., 321; *Morse* v. *Marshall*, 97 Mass., 519.

So in the action of ejectment. It is said in *Sears* v. *Taylor*, 4 Colo.: "In actions of ejectment against a mere intruder, proof of possession in plaintiff, and an entry amounting to an ouster by defendant, is sufficient to support a verdict, whether the plaintiff has declared in fee, or upon possession generally, or upon possession under district rules, without proof of such district rules or of title of record in any manner."

It follows that notwithstanding the pleadings are so framed as to put the title in issue and to enable a trial thereof, yet it is not necessarily involved, and as a matter of fact may not be litigated or determined. Hence, no matter what the verdict or judgment, the record will fail to show, on its face, whether or not the question of title has been adjudicated.

Again: No matter what the scope of the pleadings, the evidence may be so shaped as to confine the inquiry as to title or possession to the very point where the trespass is alleged to have been committed. The plaintiff in such action will often have it in his power to so confine it.

For aught the record in such action will disclose nothing but the right of possession to that very spot may have been passed upon, notwithstanding that as matter of fact the title may have been litigated, and the inquiry may have extended to the whole tract, or the whole ledge: *Morse* v. *Marshall*, 97 Mass., 519; *Hall* v. *Mayo*, 97 Mass., 416; *Howard* v. *Albro*, 100 Mass., 236; suppose the title of the owner in possession is maliciously slandered, and the party guilty of the wrong in pursuance of the slander brings his action of trespass against the owner. Appellant says: "In such case we are confined to our legal remedy, namely, a defense in such action." When the property involved is such as is in controversy here, it may require a long time, much development, works and vast expense to prepare for trial. In the meantime the owner, his title being assailed, is discouraged from expending the large sums of money necessary for machinery, etc., required in the search for the hidden treasures of his mine. And when at last we come to the trial the plaintiff may stand up in court and dismiss his trespass suit; and leave the question of title in as much uncertainty and as seriously clouded as before.

Under no circumstances, we submit, can the action of trespass afford the owner of real estate whose title is slandered, an adequate remedy for the injury done him. Clear it is, we think, that the relief he is entitled to under the statute cannot be gained in such action, nor any relief which is its equivalent.

In this connection we invite particular attention to the case of *Ayres* v. *Bensley et al.*, 32 Cal., 620; and to the brief of respondent's counsel in that case.

It is also assigned as error that there was a variance between the allegations, in the cross-complaint, descriptive of the lode, and the proof, in that the evidence showed a broader lode than that described in the pleading.

Plaintiff could not have been misled to its prejudice by any such variance as is here complained of; it was the duty of the court, therefore, to disregard it: Laws 1884, p. 211, sec. 340; p. 212, sec. 346; *Began* v. *O'Reilly et al.* 32 Cal., 11; *Peters* v. *Foss*, 20 Cal., 591; *Gay* v. *Winter*, 34 Cal., 153; *Quackenbush* v. *Sawyer*, 54 Cal., 441; *James* v. *Goodenough*, 7 Nev., 326; *Burnham* v. *Call*, 2 Utah, 433.

ZANE, C. J.:

This is an appeal from a judgment rendered in the first district court on a cross-complaint filed by respondents. Reversal of the judgment is asked on account of alleged errors in every stage of the proceedings. The alleged errors that are deemed most important, and those upon which chief reliance was placed during the hearing will be separately considered.

The appellant alleged in its complaint ownership in fee and lawful possession of lot No. 76, (describing it;) and appellant further alleged that there was in said lot a lode of rock in place, bearing silver and other valuable minerals, having its apex wholly within the surface lines thereof; that on and subsequently to the third day of January, 1883, and before the institution of this suit, the defendant company, claiming to be in the possession of the Eureka mine, adjoining plaintiff's claim on the east, had extended its underground workings into the claim of the plaintiff, and had taken therefrom 2,000 tons of ore of the value of $150,000; that the defendant company was still working, and threatening to continue, and is thereby committing waste and irreparable injury upon plaintiff's property, which is valuable for its ore alone; and plaintiff asked for judgment, for an injunction during the pendency of the suit, and for a perpetual injunction upon the trial.

Answering the foregoing complaint, the defendant company admitted that it claimed to be a corporation, and that it was in the possession of the Eureka Hill mining claim, lying immediately east of lot No. 76, but denied all the other material allegations. The defendant company also filed a cross-complaint, and alleged ownership of the

Eureka Hill mining claim known as lot No. 39, (describing it); and further alleged that it claimed a lode of rock in place therein, bearing silver and other precious metals for its entire width; that it was older in location and title than the Bullion claim; that the Eureka lode was very wide, and dipped westerly; that a small and comparatively unimportant part of the width thereof was west of the westerly surface line of lot No. 39; that the main part of the width of the vein, and its apex for the entire length of the lot, was within lot No. 39; that for more than one year past appellant had been in possession of lot No. 76, claiming to own it, and asserting an adverse claim to about 700 feet of the northerly end of the Eureka lode, and claiming that the same was part of the appellant's claim; that in pursuance of such adverse claim, and in the assertion thereof, the plaintiff had sunk a shaft in the surface of lot No. 76, near the defendant company's side line, and had extended it into defendant company's lode, and had taken therefrom a large quantity of valuable ores, carrying silver and other metals, and had appropriated the same to its own use, thereby wasting and causing irreparable damage to defendant company's property; that plaintiff continued, by said work, and by this action and otherwise, to assert its adverse claim, and, as defendant company was informed and believed, threatened to continue and would continue said work, and would further waste defendant company's property, unless restrained by injunction; and the defendant company prayed that plaintiff's action be dismissed; that its adverse claim to said lode, or any part thereof, be adjudged invalid; that the title and possession of the defendant company to such lode, for the entire length of the lot and width of the lode, although some part thereof be in lot No. 76, be quieted and confirmed; that appellant be enjoined pending the action, and upon trial perpetually; and that defendant company have such other and further relief as might be proper.

To this cross-complaint the appellant interposed a general demurrer, alleging that the facts stated did not constitute a cause of action, and also answered fully.

The court overruled the demurrer, and the appellant as-

signs that ruling as error. In the cross-complaint an attempt was made to describe the property affected, the right of the defendant company to it, and the wrong committed by appellant. Are these three facts sufficiently alleged? and, if so, do they, with the other allegations, show a cause of action?

*First.* As to the description of the property. The property consists—*First,* of the lot, and *secondly,* of the lode. The term "lot" has one signification; the term "lode" another. The lot consists of a certain number of feet in length and breadth, and is easily ascertained by measurement on the surface. There is no contention as to the description of the lot in this case. The lode consists of aggregations of peculiar matter, and its form can only be found, and its limits determined, by discerning and identifying the qualities and appearances of its composition. In some cases the apex of a vein crops out on the surface; in others it is found a hundred feet or more beneath the surface, and in such a case it can be known with certainty only by the expenditure of time, much labor, and large sums of money. The law does not require impossibilities in describing the subjects of litigation, but reasonable certainty in view of the difficulties. We hold, therefore, that the description of the property is sufficient on a general demurrer. When we reach the question of variance, we will have occasion to consider the allegations of description further. We will defer the consideration of the question raised by the demurrer as to the respondent company's right to that part of the lode in question, and will consider it with respondent company's right, as the same appears from the evidence; because, if no variance between the allegation and proofs are found, the legal questions will be identical, and it will be more convenient to consider them together.

With respect to the wrong complained of for which a remedy is sought by the cross-complaint, the appellant affirms that it is not shown that the wrong affected the property to which the plaintiff's action relates: Section 305, Code Civil Proc., (Laws Utah, 1884), is as follows: "Whenever the defendant seeks affirmative relief against

any party, relating to or depending upon the contract or transaction upon which the action is sought, or affecting the property to which the action relates, he may, in addition to his answer, file at the same time, or by permission of the court, subsequently, a cross-complaint. . . ."

The appellant instituted the original action to recover damages of respondent for alleged trespass upon the lode or ore bodies described in its complaint, and to restrain further trespass thereon. The respondent company alleged in its cross-complaint that plaintiff in the original action had set up an adverse claim to 700 feet of its lode, and had asserted, and still was asserting, such claim by the original action, and otherwise. Both wrongs, as alleged, must have affected the same property. The contentions of the original and cross-actions relate to the same property.

When this case was called for trial in the court below, the plaintiff was unwilling to proceed in the absence of certain witnesses necessary to prove the execution of a contract which it was claimed affected the rights of the parties to the property in dispute; and, to prevent an application for a continuance, the parties stipulated in writing, as we construe the paper, that any rights which the parties might have under that contract should not be litigated in this action, or in any way affected by any decision, finding, judgment, or decree therein, and to that extent (it was further stipulated) the pleadings should be modified. The rights of the parties remaining to be litigated and determined, were such as existed without regard to the contract, and the cross-cause of action was not stricken out as appellant claims.

The appellant also contends that the cross-complaint does not state a good equitable cause of action. By section 620 of the Code of Civil Procedure, *supra*, "an action may be brought by any person against another who claims an estate or interest in real property adverse to him for the purpose of determining such adverse claim." The language used in this section is very comprehensive. In terms, it authorizes an action by any person against another who claims an estate or interest in real property adverse to him, for the purpose of determining such ad-

verse claim. Whether the action shall be legal or equitable must be determined by the facts of the case. In 1 Story, Eq. Jur., sec. 76, speaking of the concurrent jurisdiction of equity, the learned author says: "The concurrent jurisdiction, then, of equity, has its true origin in one of two sources; either the courts of law, although they have general jurisdiction in the matter, cannot give *adequate, specific,* and *perfect* relief, or, under the actual circumstances of the case, they cannot give any relief at all. The former occurs in all cases when a simple judgment for the plaintiff or for the defendant does not meet the full merits and exigencies of the case, but a variety of adjustments, limitations, and cross-claims are to be introduced and finally acted on, and a decree meeting all the circumstances of the particular case between the very parties is indispensable to distributive justice. The latter occurs when *the object sought is incapable of being accomplished by the courts of law;* as, for instance, a perpetual injunction or a preventive process to restrain *trespass,* nuisance, or *waste.* It may therefore be said that the concurrent jurisdiction of equity extends to all cases of legal rights when, under the circumstances, there is not a plain, adequate, and complete remedy at law." The author, in the quotation, instances certain classes of cases in illustration of the application of the principles that he states. He mentions one class in which a simple judgment for the plaintiff or for the defendant would not meet the full merits and exigencies of the case; another in which a variety of adjustments, limitations, and cross-claims are to be introduced; another in which a perpetual injunction or preventive process is necessary to restrain *trespass,* nuisance, or waste.

In the case of *Livingston* v. *Livingston,* 6 Johns. Ch. 497, in delivering the opinion, Chancellor Kent said: "Lord Eldon repeatedly suggested the propriety of extending the injunction to trespass as well as waste, and on the ground of preventing irreparable mischief, and the destruction of the substance of the inheritance. The distinction on this point between waste and trespass, which was carefully kept up during the time of Lord

Hardwicke, was shaken by Lord Thurlow in *Flamang's Case* respecting a mine, and seems to be almost broken down and disregarded by Lord Eldon. This protection is now granted in case of timber, coals, lead ore, quarries, etc., and the present established course, as he observed in *Thomas* v. *Oakley*, 18 Ves., 184, was to sustain the bill for the purpose of injunction, connecting it with the account in both cases, and not to put the plaintiff to come here for an injunction, and to go to law for damages." A number of cases are cited in this opinion in support of chancery jurisdiction. Among them, that of *Rurder* v. *Jones*, 17 Ves., 110 (where the title to boundary was disputed); *Earl Cowper* v. *Baker*, 17 Ves., 128 (against taking stones of a peculiar and valuable quality at the bottom of the sea within the limits of a manor); *Gray* v. *Duke of Northumberland*, 17 Ves., 281 (against digging coal upon the estate of the plaintiff) ; *Thomas* v. *Oakley*, *ubi supra* (against exceeding a limited right to enter and take stone from a quarry). In all these cases the injury was considered a trespass, and in two it was strictly so; and the *principle* of the jurisdiction was to preserve the estate from destruction. In this opinion Lord Eldon was represented as saying that the principle was well established that the court of chancery, having jurisdiction for the purposes of the injunction, would not require the plaintiff to go to law for damages, but would retain it for both purposes, and do complete justice. Applying a rule familiar in cases where a bill is filed for the purpose of discovery and relief, the court of equity, having jurisdiction for the purpose of discovery, will retain it for the purpose of relief, and do complete justice between the parties, although the subject of relief might be cognizable in a court of law.

This cross-action was brought for the purpose of trying the appellant's adverse claim to the right of possession and title to the lode in question, and to quiet the respondent's title thereto, as well as for the purpose of enjoining the appellant from mining and removing ore therefrom. In order to try the case, and determine it for these purposes, it is necessary to ascertain the boundaries of the vein; for, when a judgment or decree is rendered for specific

property, or with respect to it, whether the specific property be personal or real, it is necessary to identify the property, and to that end to describe it. It would be idle to quiet the title to real estate generally, without describing it so that it could be identified. It would be vain to enjoin a party from committing waste on land, or from carrying away the ores from a mine, without describing the land or the mine, and thereby identifying it. Without such identification the decree would be a vagrant.

The appellant makes no claim to the surface of lot No. 39, nor does the respondent make any claim to the possession or the title of the surface of lot No. 76. The real oppugnancy in the case is concerning the description and identification of the apex of the lode, and as to whether the fact that a part of the apex is within the vertical side lines of the prior location carries the entire vein within the vertical end lines extended westerly. In view of the issue involved, and the relief sought by the cross-complaint, would a judgment at law for the plaintiff or for the defendant meet the full merits and exigencies of the case? The respondent company alleges in its cross-bill that it is in possession of the entire vein; therefore ejectment could not be maintained. The only remedy. remaining would be trespass. Such a judgment would settle the right of possession at the time and place of trespass, and it might or might not determine the title. That would depend upon the issues, the findings, and the judgment. Such a judgment could not ascertain the limits of the apex of the lode, and identify it by metes and bounds, and restrain the appellant from mining and carrying away any portion thereof not identified. It is plain that an action of trespass would not furnish a plain, adequate and complete remedy.

In the case of *Mercedes Min. Co.* v. *Fremont,* 7 Cal., 321, the court says: "But when the alleged trespass is taking away that which cannot be replaced, and which constitutes the substance of the mine itself so as to diminish its value when restored to the owner, it constitutes a very different case. . . . The only value of a

gold mining claim, in most cases, consists in the mineral. For timber, for cultivation, and for other purposes they are generally valueless. If a party removes the gold, he removes all that is of any value in the estate itself. It is emphatically taking away the entire substance of the estate. Another material circumstance is the impossibility of making any certain estimate of the amount of injury done. In the case of a coal mine or stone quarry, the amount removed can be substantially ascertained by admeasurement. So, in the case of timber trees, their size, number, and value can be substantially ascertained. But in reference to gold mines this is not the case. There is no mode of estimation approaching substantial accuracy, and hence the greater necessity for preventing that injury which you cannot estimate, and therefore cannot compensate adequately."

We are of the opinion that the cross-complaint states an equitable cross-cause of action. This view is supported by the following cases: *Holland* v. *Challen*, 110 U. S., 15; *Central Pac. R. Co.* v. *Dyer*, 1 Sawy., 641; *Curtis* v. *Sutton*, 15 Cal., 260; *Reynolds* v. *Crawfordsville Bank*, 112 U. S., 405; *McMahon* v. *Henning*, 1 McCrary, 516; S. C., 3 Fed. Rep., 353; 3 Pom. Eq. Jur., secs. 1396, 1397, and notes.

The next question raised, in the order in which we are considering them, is one of fact. Does the evidence show one broad lode, or two veins? The respondent claims that the ore found in the two claims constitutes one broad lode, and towards the north end of the Eureka it extends beneath the surface under a portion of the surface of the Bullion. The appellant claims, on the contrary, that there are two veins or lodes. To this question, men of science, of wide reputation and great eminence, as well as skillful and practical miners, were called as witnesses. After a careful inspection and observation of all the workings of the mines, they enumerated their observations, described what they had seen, and reached opposite conclusions.

The following is a question propounded to Dr. T. Sterry Hunt, and his answer thereto:

"*Question.* From your examination of the property in

the Eureka, Montana and Bullion lodes, of which you have testified, the facts which you observed there, and a description of those facts, which you have now given to the court, I will thank you to state to the court whether or not it is your opinion that all of those workings are in one and the same lode? *Answer.* Most undoubtedly, as I have defined, that it is all one and the same zone impregnation, and I do not see how it is possible to divide it into two parts unless you divide it into a hundred parts. In many cases, as I have described, you have three or four parallel courses, which are, as I have endeavored to explain, like so many parallel avenues, cut off, continued through, and, so to speak, stair-like. You have lodes and bands, and bands between bands, and all those connected with one another, forming a net-work, which makes, to my mind, an absolute unity throughout the whole mass. I confess, if I were asked to divide it, I don't see how it would be possible to make any distinction between one part and another. They are all indissolubly connected with one another, having a common origin and a unity throughout."

The following is a question asked Prof. J. E. Clayton, and his answer thereto:

"*Question.* From the facts which you have now stated to the court, and your study of the relation they bear to each other, and to this property, what are the general conclusions you draw from them?

*Witness.* My general conclusions are:

*First.* That the eruption of the vast body of trachyte or porphyry, immediately east of the Eureka Hill orebearing zone, was the primal cause of the fissuring, crushing and buckling of the lime beds.

*Second.* That the heat evolved by this immense mass of volcanic rock was an active agent in driving the hot gases and mineralized solutions up through the broken and fissured zone of limestone, now known as the 'Eureka Hill Lode or Ore Zone.'

*Third.* That the character of the ore deposits shows that the heat was much greater along the east flank and center zone, next to the volcanic rocks, than it was along

the west flank of the ore deposits, and vastly greater at the beginning than at the close.

*Fourth.* That the whole zone of ore deposits shows beyond a possibility of a doubt that the ore and quartz was deposited by chemical solutions and substitution, mainly of quartz and ore in the place of the lime dissolved out, instead of the filling of open fissures or other cavities made by the upheaval.

*Fifth.* That all the facts taken together show that the ore deposits throughout the entire zone were induced by one great cause, namely, the eruption of the volcanic rocks near by, and that all of the various forms and character of the ore deposits in the zone of impregnation are due to the various mechanical and chemical conditions present, and the differences of temperature during the earlier and later periods of the process of depositing the ore.

*Sixth.* That the Eureka Hill ore belt or lode presents a unity of cause and effect throughout; that its various ore bodies and impregnations had one common source that was continuous in its operations from its beginning to its close; that its ore bodies are all connected with the central line of deposits in the zone, and cannot be segregated as separate and independent veins distinct from each other in origin or character. Hence the whole mineralized zone should be taken as a unity or as a lode."

The following is a question put to Prof. William P. Blake, and his answer thereto:

"*Question.* From your examination, did you find more than one vein in the properties in controversy?

"*Answer.* I arrived at the conclusion that there are two veins in the hill.

"*Q.* Won't you state, in your own manner, your reasons for that conclusion, and any other facts or circumstances or authorities bearing upon it, and any observations which have a remote or indirect bearing upon it that occur to you.

"*A.* I have six reasons to give for arriving at that conclusion. Briefly stated, they are:

"*First.* That the veins are visible, distinct, and sep-

arate. The surface exposures or croppings show it. There are two parallel lines of croppings, separated by strong outcrops of limestone.

"*Second.* The veins can be followed separately, not only upon the surface, but below the surface, for about 2,000 feet in two well-defined, distinct, and approximately parallel veins.

"*Third.* The two veins are marked by outcrops of quartz gangue or vein-stone, showing above and below the surface, and separated by strata of limestone between the two veins without quartz gangue.

"*Fourth,* The ores of the two veins differ in their composition and value.

"*Fifth.* The veins are separated geologically, being upon two distinct geological horizons.

"*Sixth.* They have been worked independently, and can be worked independently in the future."

The following is the answer of Prof. Jenny to a similar question:

"Passing in conclusion upon the subject with respect to the question of whether the east and west veins, and the rock lying between them, is to be regarded as one lode, or is to be regarded as two separate veins, if I understand the question rightly, in assuming the position that the limestone and the veins contained within it—the east and the west veins—constitute one lode, there are upon a person so taking the position two undertakings, a positive and negative one. *First,* he must show that this whole rock—this country rock lying between the veins and lying on each side—is all really vein matter; and, really, beyond that, he must show further the negative that these mineral deposits are not capable of being separated into two veins; for, if they are capable of being separated into two veins its unity is destroyed."

After hearing the testimony of the various witnesses examined, and after making a personal examination of the workings with the consent of the parties, the court below found that the Eureka vein was one broad lode. Among the findings of the court on this point are the following:

"The Eureka mining claim is located upon a mineral lode bearing silver and other metals, and in its length and course runs northerly and southerly from the discovery point.  From the discovery point southerly the ground rises, the rock is denuded, and the outcrop of the lode is visible at the surface.  From the discovery point northerly, the ground descends, and the rock is denuded, and the lode visible at the surface until within about 750 feet from the northerly end line, and from thence to the northerly end line the lode and bed-rock are covered with sedimentary deposit, increasing in depth as lower ground is reached, and about 600 feet of the northerly part of the Eureka mining claim is covered by such deposit to the depth of from 100 to 125 feet.  Beneath this deposit the lode comes to the surface of the bed rock, is not visible at the surface, and could not be exposed without considerable exploration and expense, which would be useless in practical mining.  The Eureka mining claim was located on and along the general strike and course of the Eureka lode, and included the apex of it, and its westerly boundary so far as the same was visible at the surface, and as it appeared to run in its northerly course.  The ground northward of the discovery point of the Bullion lot (68) again rises to the northward.  The lower ground, which includes the part of the lode in dispute, has been much shattered and disturbed by cross-breaks, and there appears to have been a westward push or throw of the ground at and near the point of the most prominent cross-break, which is shown by curvature of the stratification, and which at this point has widened the lode and given it and especially the western limit of it, a bend to the westward.  From the discovery point of the Eureka mining claim, the Eureka lode runs northward, and crosses the northerly end line of the mining claim, and from thence to the discovery point of the Bullion mining claim, lot 68. The western boundary of the lode is within the surface ground of the Eureka mining claim from the discovery point northward, until it reaches the point where the westerly side line of the Eureka mining claim intersects the easterly side line of the Bullion mining claim, lot 76,

and from thence to the northerly end line of the Eureka mining claim the lode, in its width and on the apex, is partly within and under the surface ground of the Eureka mining claim, and partly within and under the surface ground of the Bullion mining claim, lot 76, and at no point does the whole width or apex of the lode depart from the side line of the Eureka mining claim. The dip of the ore bodies is westerly, and at varying angles from the horizon. The absence of explorations on the top of the lode, and the depth of the sedimentary deposit, renders it impossible to define the western limit of the lode at the apex, but the main shaft of the Eureka works is about 100 feet higher than the discovery point of the Bullion, lot 68, and the 300-foot level of the Eureka works nearly corresponds with the 200-foot level of the Bullion works, and on and from this level the western limit of that part of the lode in dispute can be proximately fixed, and the blue line on Exhibit A shows proximately the western boundary at this level."

In view of the evidence, we cannot say that the court erred in its findings on this point.

Counsel for appellant also claim that there was a material variance between the allegations of the cross-complaint and the evidence, and that the court erred in not so holding, and in not granting a non-suit. As we have before stated, the description of respondent company's surface claim is perfect, but the difficulty arises in describing the lode. The evidence shows a larger portion of the apex to be west of the west surface side line of the respondent company's claim than would appear from the allegations of the complaint. It is, however, alleged in the complaint that the main part of the apex is east of the line, and it is evident from the allegations of the cross-complaint that the respondent company undertook to describe and claimed the lode in its entire width, the part west as well as east. The practice in chancery is, when there has been a full investigation of all the evidence, to permit the parties to amend the pleadings so as to make the allegations correspond to the proofs.

The Code of Civil Procedure of this territory provides

that "no variance between the allegations in a pleading and the proof is to be deemed material, unless it has actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits.   Whenever it appears that a party has been so misled, the court may order the pleading to be amended upon such terms as may be just."   And section 342: "Where, however, the allegation of the claim or defense to which the proof is directed, is unproved, not in some particular or particulars only, but in its general scope and meaning, it is not to be deemed a case of variance within the last two sections, but a failure of proof:" Laws Utah, 1884, p. 211.

Any variance between the allegations and proofs in this case ought not to have misled the appellant to its prejudice.   We do not find that the cross-complaint is unproved in its general scope and meaning.

The court found that the western boundary of the lode in question is within the surface ground of the respondent company's claim until it reached a point about 600 feet south of the north end of the claim, and from thence to the north end line the lode, in its width and on the apex, is partly within and under the surface ground of the Eureka claim, and partly within and under the surface ground of the Bullion claim, and at no point does the whole width or apex depart from the side line of the Eureka claim; and the court held that the respondent was entitled to the whole lode.   In this ruling the appellant claims that the court erred.

This brings us to the legal proposition whether the first locator, having the apex of a vein entirely within the surface lines of his claim for a portion of its length, and the remaining portion partly within and partly without, and within the surface lines of another claim, owns the whole lode within the end lines of the claim.   We have been referred to but few authorities on this point, and those few are not in entire accord.   It is therefore necessary to carefully consider the provisions of the law providing for the location and entry of the mineral lands of the United States, in order that we may discern therein the intent of Congress.

The respondent company's claim was located under the act of July 26, 1866, and patented under the act of May 10, 1872.

The first section of the former act declares the mineral lands of the public domain, surveyed and unsurveyed, to be free and open to exploration and occupation, etc. The fourth section gives an additional claim for discovery to the discoverer.

The act of 1872 is entitled "An act to promote the development of the mineral resources of the United States." Its first section declares all valuable mineral deposits of the public domain to be free and open to exploration, etc. The second section forbids a location without a discovery of a vein or lode. The fourth section provides that where a tunnel is run for the development of a vein or lode, or for the discovery of mines, the owners thereof shall have the right of possession of all veins or lodes within 3,000 feet of the face of such tunnel on the line thereof, not previously known to exist, discovered in such tunnel, to the same extent as if discovered from the surface; and locations on the line thereof, not appearing on the surface, made by other parties after the commencement of the tunnel, and while being prosecuted with reasonable diligence, shall be invalid. And other parts of the act require a certain amount of development work for each year, and, in case of failure to perform such development work, the claim is to be open for re-location. The fourteenth section provides that, where two or more veins intersect or cross each other, the prior locator shall be entitled to all ore or mineral contained within the space of intersection; and, where two or more veins unite, the oldest or prior location shall take the vein below the point of union, including all the space of intersection.

These mining laws unmistakably discover an intention to favor and reward diligent discoverers and developers of mines. Letters patent protect the man who invents a new machine for the application of the forces of nature to the uses of man, for the reason that his intelligence, his labor, and his enterprise have conferred a benefit upon society. The public good, as well as justice, demands that the in-

ventor should be encouraged. So the prospector who climbs the mountains, and digs and toils, and discovers a valuable mine, ought to be protected, encouraged, and rewarded for his enterprise, his toil, and his skill. This, it is believed, the public good, as well as justice, demands, and justice and the public good are the chief ends of this law.

Section 2 of the act of 1866 provides "that when any person or association of persons claim a *vein* or lode of quartz or other rock in place, bearing gold, silver, cinnabar, or copper, having previously occupied and improved, etc., . . . it shall and may be lawful for said claimant . . . to file in the local land office a diagram of the same, so extended laterally or otherwise as to conform to the local laws, customs, and rules of mines, and to enter such tract, and receive a patent therefor granting such mine, together with the right to follow such vein or lode, with its dips, angles, and variations, to any depth, although it may enter the land adjoining, which land adjoining shall be sold subject to this condition." The claim to be secured is that to a lode or vein, and the grant is of the mine (which appears to be synonymous in its meaning with the terms "vein" or "lode"), together with the dips, angles, and variations, to any depth, and the right to follow the lode into land adjoining.

The third section requires the surveyor general to designate in his survey the value of the labor and improvements, and the character of the vein exposed, and declares that the survey shall in no case cover more than one vein or lode, and no patent shall issue for more than one vein or lode, which shall be expressed in the patent issued. This section regards the vein as the valuable subject of the patent.

Section 4 makes provision for the adjustment of government surveys to the limits of mining claims previously located, and provides that no location thereafter made shall exceed 200 feet in length along the vein for each locator, with an additional claim for discovery to the discoverer of the lode, with the right to follow such vein to any depth, with all its dips, variations, and angles, to-

gether with a reasonable quantity of surface for the convenient working of the same as fixed by local rules; and provides, further, that no person may make more than one location on the same lode, and not more than 3000 feet shall be taken in any one claim by any association of persons. While this section limits the right of a person to a lode longitudinally, it does not limit such right in the direction of the width of the lode. The right as to the width of the surface ground is limited, but not the right as to the width of the vein.

Section 2 of the act of 1872 provides "that mining claims upon veins or lodes shall be governed, as to length, along the vein or lode, by the customs, regulations, and laws in force at the date of their location. And mining claims located after the passage of the act shall not exceed one thousand five hundred feet in length along the vein or lode; but no location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located. No claim shall extend more than three hundred feet on each side of the middle of the vein at the surface, nor be limited to less than twenty-five feet on each side of the middle of the vein at the surface."

Section 3 declares "that the locators of all mining locations heretofore made, or which shall hereafter be made, on any mineral vein, lode, or ledge, . . . shall have the exclusive right of possession and enjoyment of all the surface ground included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downwards vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downwards as to extend outside of the vertical side lines of said surface locations." And the longitudinal rights of locators are limited by vertical planes drawn downward through the end lines of their claims. The proviso to this section limits the locator's rights on the surface to the surface lines of his claim, but recognizes his right to the entire vein beneath the surface and downwards.

This section gives the exclusive right of possession and

enjoyment of the surface of a claim, and to all veins the apexes of which are found within planes extended downwards vertically through the surface lines. Does this language mean that the apex must be entirely within those lines, or that it must not be entirely without? When the apex lies partly within and partly without, was it the intention to segregate the vein, or, so to speak, to split it laterally?

The fourteenth section gives the prior locator the entire vein within the space of intersection; and, where two or more veins unite, the oldest or prior location takes the whole below the point of union, including the space of intersection. These provisos recognize no division. The point of union may be beneath the surface of the junior claim, and that claim may have the larger vein, but that makes no difference— the first discoverer takes the entire vein below the point of union. The point of union must be regarded as in fact the apex of the united vein, or the tops of the veins which form it must be its apexes; but the apex of the vein first discovered is the legal apex of the united vein, and gives the right to the whole. By complying with the law the first discoverer takes it all as the reward for his diligence and enterprise, and this would be so notwithstanding that the united lode might be under the surface ground of the junior claim. In a case where a number of veins have so united, if the ore indications had been such as to authorize the conclusion that there was but one broad vein or lode, then each locator would have been confined to so much as was beneath the surface, and the vein at last might be found beneath the surface of the junior claim, in which case the first discoverer would lose all but a fraction, and the junior discoverer would have almost all that is valuable. If the law is as claimed by appellant, such would be the result; and when the apex is found, as in this case, a hundred feet beneath the surface, the first discoverer may lose the main body of the vein, if he does not, before locating, take time to explore the entire top of the vein by sinking shafts; and he must lose more or less in any case where the apex is so broad that the law and the rules of miners will

not permit him to make his surface claim wide enough to cover it.

The lode in question was located under the law of 1866, and section 16 of the act of 1872 declares that nothing contained in that act shall be construed to impair in any way rights or interests under existing laws. Under the law of 1866 the surface ground was merely for the convenient working of the lode. The discoverer and first locator took the lode in its entirety. The law contemplated its segregation in its length, not in its width. It refers to lodes between the end lines, not to a part of a lode. No expression can be found in it indicating an intention to limit the rights of the locator to a portion of the lode in its width. The discovery of any part of the apex of a vein is regarded by it as a discovery of the entire apex. And we think that the law of 1872, when all of its provisions are considered together, and in connection with the former law on the subject, as it should be, evinces the same intent. Under this law the discoverer of any part of the apex gets the right to its entire width, despite the fact that a portion of the width may be outside of the surface side lines of his claim extended downwards vertically. While he has no right to the extra-lateral surface he has a right to the extra lateral lode beneath the surface.

This view is in harmony with the case of *Flagstaff Silver Min. Co.* v. *Tarbet*, 98 U. S., 463. In that case the patent of the defendant was for 2,600 feet in length and 100 feet in width, and the location was across the vein. The court held that the side lines became the end lines; that a party could not locate across the vein, and then claim the full length of his claim on the strike, nor could he follow the vein longitudinally entirely outside of his surface lines vertically extended. The court said: "Slight deviations of the outcropping lode from the location of the claim would probably not affect the right of the locator to appropriate the continuous vein, but if it should make a material departure from his location, and run off in a different direction, and not return to it, it certainly could not be said that the location was on that vein or lode further than it

continued substantially to correspond with it. Of what use would a location be for any purpose of defining the rights of the parties if it could be thus made to cover a lode or vein which runs entirely away from it?"

In the case before us the apex of the vein did not run off in a different direction, and not return to the location. According to the findings in this case, the location of the claim was along the apex of the vein, and the southerly portion of the apex was entirely within it, but the northerly end of the apex widened out so that the lode was partly within and partly without.

The circuit court, district of California, used the following language in its charge to the jury in a mining case: "But if you find that said vein or lode so cut by defendant is not one of the veins or lodes discovered within any claim the title to which you find in the plaintiff, and that its apex or top is not within the side lines of any such claim of plaintiff drawn vertically downwards, but is a separate, independent vein, *every part* of which *lies* to the eastward or outside of and beyond any claim the title to which you find to be in the plaintiff, and *no part* of the apex or top of which is within the side lines of such claim drawn vertically downwards, then it does not belong to plaintiff, and your verdict will be for defendant." *North Noonday Min. Co.* v. *Orient Min. Co.* 6 Sawy., 299; S. C. 1 Fed. Rep., 522.

To the same effect is the case of *Rose* v. *Richmond Min. Co.*, 17 Nev., 25, although there the point seems to have been conceded by counsel on both sides. The United States circuit court of Colorado held, however, that a right to an entire lode cannot be asserted under a location covering a part only of its width, and is only good for the part within the lines extended vertically downwards: *Hall* v. *Equator Mining & Smelting Co.*

Other decisions upon the point were mentioned by counsel on the argument, but we are unable to obtain any authentic report of them.

The ruling of the court admitting in evidence the patent from the United States to the Eureka Mining Company, which was the source of respondent company's title, is

assigned as error. The laws of the United States require all patents from the general land office to be recorded in that office, and the commissioner is required to furnish exemplifications thereof when required by interested parties, and such exemplifications, authenticated by the seal and certificate of the commissioner, are made evidence equally with the originals thereof. Rev. St., U. S., secs. 454, 458, 461, 891, 2469, 2470. We are of the opinion that section 1198 of the Utah Code of Civil Procedure does not apply to a patent so exemplified.

Numerous other errors are assigned on this record, none of which, in the opinion of this court, are sufficient to authorize a reversal.

Finding no error in the record, we affirm the decree of the trial court.

Powers, J., concurred.

Boreman, J. (dissenting): I am unable to concur with the majority of the court in the views they have just expressed, or in the conclusion they have reached. Our differences are so radical that I am constrained to state the principal grounds for my non-concurrence. The Eureka Hill Company owns the Eureka claim, and the Bullion Company (appellant) owns the Bullion claim 76. Both claims were located under the law of 1866, and both were patented under and by virtue of the law of 1872.

1. The first question which requires consideration is whether the cross-complaint states grounds for equitable relief. The following section is the authority claimed for the equitable interference to try the title to the property: "An action may be brought by any person against another who claims an estate or interest in real property adverse to him, for the purpose of determining such adverse claim:" Laws Utah, 1884, p. 271, sec. 620.

I am inclined to think that this section is not applicable to the case at bar. If the interpretation put upon it by counsel for the respondent be correct, that the party suing must be in possession, and the party being sued must be out of possession, then, in my view, the respondent, the

Eureka Hill Company, has, in its cross-complaint, stated itself out of court. The facts alleged show the appellant to be in the permanent occupancy—the actual possessor of the lode or ground—as much as the respondent is. The appellant is on the lode at one place, and the respondent is on it at another. The respondent claims that it is in possession as the owner of the Eureka claim, and the appellant claims possession as owner of the Bullion claim 76. The respondent claims that it is in possession of the place where the appellant is working, but admits that its possession is only constructive, because it owns the ledge. But such constructive possession can avail nothing against the appellant, when the appellant has ousted respondent from the part occupied by appellant. To such part, the appellant's occupancy is exclusive and hostile to respondent's, the appellant claiming title to it as part of the Bullion ground. To so much, therefore, of the ground as is reached by the appellant through its shaft, sunk upon its own ground, there can be no question of appellant's actual possession. It was more in possession than a mere trespasser. It was not going and coming upon the ground as one who goes upon land to get wood, cut grass, or get sand, but it was there doing work, and continuous work, claiming to own the ground and lode, and proposed to continue there. It certainly, therefore, was not out of possession, and the statute does not apply unless it be out of possession. But it is said that the Bullion Company (appellant) claims more ground than it actually occupies, namely, 700 feet of the "northerly end" of the Eureka lode. But by the interpretation of respondent, and also of the lower court, this 700 feet includes the place actually occupied by appellant. . If this be true, then in order to defeat a trial, by action at law, of the legal title to that part actually occupied by appellant, it is only necessary for the party suing to say that the party sued claimed more than he occupied. I do not think this kind of manœvering should prevent a party from having his legal title tried by action at law, in which he would have a jury as his right. But it may be said, and I think not without some truth, that from the language of the cross-complaint we have

no right to infer that the 700 feet in question embraced the part in actual occupancy of appellant. Yet if this be true, the question remains, what right has a party in a suit over ground occupied by defendant to make by his cross-complaint a contest to ground not occupied by a defendant, in order to defeat a trial by jury of the title to the part occupied? Such a right cannot exist by reason of the rule that, if equity attaches for one purpose, it attaches for all, because—*First*, the trial by jury is a constitutional right; and, *second*, if the party sued be in occupancy of a part of the ground, the suit in equity cannot be resorted to, for the reason that it can, under the statute, be resorted to only where defendant is out of possession. A bill in chancery cannot be used as an action of ejectment.

It is well recognized that relief in equity, by way of injunction, may be resorted to, to stay waste or trespass; but this is pending litigation of the legal title, and the litigation of the legal title must be in a court of law. The injunctive relief is to stay waste or trespass, but the relief at law is to settle a legal title. Because one has such right to go into equity to stay waste or trespass is not a ground for taking jurisdiction to try legal title in equity, and I do not think any authority can be shown for it.

It is sometimes said, and in one instance by high authority, that the constitutional right of trial by jury is satisfied by the trial of the issue as an issue out of chancery, but I am unable to subscribe to such a doctrine. Such a jury is not a constitutional right, and it is not to try the title in the true sense of the word, but is simply used to enlighten the conscience of the chancellor, and has no binding effect upon the court, or upon the rights of the parties. But in the case at bar there was no trial by jury of any issue, either out of chancery or otherwise. Under the section of the statute referred to, I can therefore see no authority for a resort to an equitable proceeding.

It is then a question whether, aside from the statute, there is any authority for the interposition of equity. Is it contended that the powers of a court of law are not sufficient to afford a complete remedy, or its modes of pro-

ceeding are inadequate to the purpose? I am unable to see wherein either trespass or ejectment might not give a complete remedy, and that such mode of proceeding would not be adequate to the purpose. Trespass would settle the title to the ground trespassed upon, and ejectment would settle the title to the whole lode, and guard all the rights of the parties: *Bullion Min. Co.* v. *Crœsus Gold & Silver Min. Co.*, 2 Nev., 168; Bainbridge, Mines (4th London Ed.), 332.

Where, as in this case, the question relates only to legal titles, it would seem that a suit at law is the appropriate and only appropriate place to try them. Ejectment is the remedy usually resorted to throughout this whole nation to try titles to land. In this territory, the action is in the nature of ejectment; and if it allows the title to be tried, and that title be legal, what is there for equity to deal with? The remedy is complete.

But it is contended that the mode of proceeding is inadequate, in that the judgment would not show on its face that the title was settled, and that this must be shown by extraneous evidence, which is frequently lost, or at least difficult to obtain. I do not think that the mode of proceeding can be said to be inadequate, simply because the judgment does not show that the title was tried. The mode of proceeding referred to in such cases is that which is used to try the title, and not that which is used *to show that* the title was tried. The mode of proceeding would be fully adequate to try the title; and, if that be so, the simple fact that the judgment did not show that the title was tried, is a very attenuated thread upon which to hang the interposition of equity, and to deprive a party of a constitutional right of trial by jury. Besides, if the argument in behalf of the equitable interposition can be upheld in such a case, then there is no case of ejectment or trespass in which the same reason for such interposition cannot be shown. The inevitable logic of said interposition of equity is to strike down the action of ejectment and trespass altogether for the trial of the legal title. But a complete answer to the argument that the judgment would not, and the decree would, show that the title was

tried, is to be found in the fact that, especially in eject-
ment, the general presumption is that the title was tried,
and that such judgment is a bar to the subsequent trial
of the title to the same property, unless it be shown that
the title was not tried.

2. The whole question regarding the title to the ore
bodies inside the Bullion lines could have been settled in
the principal action. The respondent (Eureka Company)
by its cross-complaint, claims that by trespass it could only
have settled title to the spot where it alleged that the
Bullion Company was trespassing, and the trespass was
alleged at one point, through one shaft. If this were true,
the reasoning would show simply that, where a party is
sued for trespassing all over a 10-acre field, he can, in re-
sponse, bring a cross-bill alleging that he claims the lot,
and that the other party is trespassing at one point on it,
and that he cannot bring trespass, because, by so doing,
the title to only that one point could be settled, whereas
he wanted to settle the title to the whole lot, and resorted
to equity to do it, as at law he could settle title to the one
point only. It would seem strange that he should not
realize that the title to the whole 10 acres could have been
settled in the principal suit, without a resort to equity, for
in the principal action title to the whole 10-acre lot could
be put in issue. That is this case. The principal action
charged defendants with trespassing all through the
Bullion claim, under ground, and asked judgment against
defendants for such trespass. If respondent (defendant)
and not the Bullion Company, had the right to such lode
in the Bullion ground, could it not have been so ascertained
in that action, and defendant have had judgment? If that
action would not have settled that question, nothing would
have been settled in it; for the whole lode, so far as it was in
the Bullion ground, was claimed by the Bullion Company,
and its right thereto denied. It is claimed that the cross-
complaint is made in order to settle the adverse claim of
the Bullion Company to so much of the Eureka lode as is
found inside of the side lines of the Bullion. The princi-
pal suit is to exactly the same effect. It charges respond-
ent with trespassing all through that part of the Bullion

ground; and if the respondent could show that all of its works under the Bullion were upon its own ledge, would not that settle the question of title? This cross-suit is not a suit to settle boundaries, and nothing in it would lead a person to presume that such was its purpose. The principal suit, in my judgment, would have given all of the relief that the respondent could claim under the cross complaint.

3. The statute in regard to cross-complaints requires that the affirmative relief asked in a cross-complaint must be one "affecting the property to which the action relates:" Laws Utah 1884, p. 207, sec. 305. The relief granted by the court affected the property to which the principal action relates, but there is no statement in the cross-complaint affirming that the relief prayed for does in any manner affect such property. That it does so relate is a matter of the merest inference. The principal action has reference wholly to a ledge or lode having its apex inside of the side lines of the Bullion claim, and the cross-complaint speaks only of a ledge or lode having its apex inside of the side lines of the Eureka claim. The only intimation that anything else is included, is a reference to an immaterial departure from the side lines at one point and for a short distance. With this "unimportant" variation, it refers to no lode whose apex is not wholly inside of the Eureka claim. The ground about which the principal suit has to do, is a lode whose apex is wholly inside the side lines of the Bullion claim. The cross-complaint, therefore, on its face, does not affect the property to which the principal action relates, and the cross-complaint is not warranted or authorized.

4. That these two actions, the principal one and the cross-complaint, are in regard to the same ground, is not a matter of allegation, but one of bare inference, from the well-known fact outside of the pleadings that the northern ends of the two claims overlap each other, and thus present a surface conflict; and this is a reasonable inference, if we are allowed to resort to bare inferences. Both claims have a northerly and southerly direction, and, as they proceed north, approach, and for some 700 feet over-

lap, each other, forming a wedge-shaped parcel of ground, with the point of the wedge directed south. It would seem to me that any one reading the pleadings, and knowing of this triangular surface conflict, and assuming that the principal action and the cross-complaint had, or ought to have, regard to the same property, would necessarily conclude that the contest on this cross-bill must have reference wholly to this overlap—this wedge—and so much of the ledge as should pass out of the side lines on the dip. Such a conclusion, to my mind, is inevitable and irresistible.

But after the action had been pending for a time, and a trial was about to be entered upon, the parties entered into a stipulation which completely removed this "wedge" out of the case, and all rights regarding the same were to be held in abeyance. This stipulation provides that the judgment in the case at bar shall not prejudice nor affect the rights of the parties thereto regarding the "wedge;" but there is no provision therein precluding the stipulation from affecting the judgment in this case. The judgment shall not affect the "wedge," but the stipulation may affect the judgment. Had it been intended that the stipulation should not affect the judgment, it is presumed that it would have been so stated. It was a stipulation *in this case*, and made a part of the judgment roll, and the very purpose of it was to affect the judgment. If not so, why was it entered into in this case, and the pleadings modified accordingly by order of court? It seems to me that, even if both parties had agreed that it should not affect the judgment, still the court could not have reached a conclusion favorable to respondent without considering the title to the "wedge." But they did not so agree, although they removed the "wedge" out of this case. It was evidently then considered by the court as in the case. But what is the effect of its removal? To my mind, the effect is to take the heart out of the case. There is nothing left to litigate. The removal of all questions regarding the title to the "wedge" removes all questions regarding the entry of the lode into the Bullion ground. In the cross-complaint it is held, if anything is held as to the Eureka

ledge entering the Bullion ground, that it so enters on
the dip, and not otherwise. But there is no way for it
to dip into the Bullion ground, except by passing through
the "wedge," either on the apex or on the dip. The title
to the "wedge" is therefore an important factor in the case;
and, if the title to it is by stipulation held in abeyance
the title to the alleged Eureka lode, either on the dip or
on the apex, is necessarily held in abeyance. It is not
to be recognized as belonging to anybody. If the court
cannot pass upon the title to the "wedge," how is it to
pass upon the title to an extension of the ledge, which is
found only by the court deciding who owns the "wedge?"
The Eureka Company can have no right or title to the lode
passing into the Bullion ground, no matter whether on
the dip or on the apex, unless it owns the lode just before
it passes into such ground. The Eureka Company claims
title to the lode because it first located it, and claims
the right to follow it. If, in attempting to follow it, there
is a space that it cannot show title to, how is it possi-
ble to show title to that which is beyond? Its title must
be continuous from the ground it is admitted to own, clear
into the disputed ground. If this continuity is broken,
it holds nothing beyond. The basis of its claim to so
much of the ledge as is in the Bullion ground is that it
is a continuation of that which it is admitted to own.
If, then, its title to so much of the ledge as intervenes
between what it is admitted to own and that which is
in contest is not and cannot be established in this action,
but is held in abeyance, it can have no possible stand-
ing upon which to make a claim to the continuous part
in the Bullion ground. It is like the accretions to land
bordering upon a body of water. The claimant has title
to the accretions because he owns the land to which the
accretions attach; but, if his title to the land thus border-
ing on the water is not to be shown or proved, there is,
to my mind, no way for the claimant to establish his
title to the accretions. In the present case, the "wedge"
is, by stipulation, taken out of the case, and hence there
is no way for the Eureka Company to establish its title to
the parts of the lode beyond the "wedge." I do not

think the trial could proceed, over the objection of the
appellant, after attention was called to the stipulation;
and, if the trial should proceed, judgment for the appel-
lant was inevitable, for the "wedge" extended clear along
the whole 700 feet, and there was no way for the Eureka
Company to reach the Bullion ground except through the
"wedge." All of its works, its drifts, and cross-cuts,
through which it sought to have its connections with the
Bullion ground, were through the "wedge." The very
place where the Bullion Company would strike the lode
in its shaft, as specified in the cross-complaint, was in
the "wedge," or in the ledge after it had passed through
the "wedge" and into the Bullion ground. If it could not
prove title to the "wedge," how was it harmed by the works
of the Bullion Company? The Bullion Company was not
on ground to which the Eureka could prove title, and with-
out this it had no right to complain. All of the drifts,
cross-cuts, and other works through which respondent car-
ried its experts and other witnesses lead through the
"wedge." Blot the "wedge" out, and the connection with
its lode was completely broken.

5. The case tried was not the case made by the plead-
ings. The cross-complaint alleges that the Eureka Com-
pany (respondent) is owner of, and in possession of, the
Eureka mining claim, and "that said mining claim con-
tains a lode of rock in place, bearing silver and other
metals, the *course, strike, or apex* of which are in the said
mining claim, and *between the side lines thereof*, and in di-
rection nearly parallel to said side lines; that said lode in
the Eureka mining claim is very wide, and *dips* westerly,
and, by a variation of the *hanging wall* at *one point* and
for a *short distance*, the said wall, and a *small* and *com-
paratively unimportant part* of the width of the lode, is
westerly of and outside of the westerly surface side line
of the Eureka mining claim, and in ground claimed to be-
long to the Bullion mining claim, lot 76, but for the en-
tire length of said Eureka mining claim the *main part of
the vein* in its width is in, and has its *apex* in, the said
Eureka mining claim;" that the Eureka claim is older
than the Bullion, (76), yet that the plaintiff (Bullion

Company) for over a year has been in possession of, and claiming to own, the Bullion mining claim, and "has set up and made, and still asserts, an adverse claim to about 700 feet of the *northerly end* of said Eureka lode, the property of said defendant, and said plaintiff claims that about 700 feet of the northern end of said Eureka lode belongs to and is a part of said Bullion mining claim, lot 76, and that *plaintiff owns* said part of said lode as a part of said mining claim; that the plaintiff, in pursuance of said adverse claim, in the assertion thereof, within three months last past, has sunk a shaft on the surface ground of the said Bullion mining claim, lot 76, near the westerly side line of the Eureka mining claim, and extended the same *down and into* the Eureka lode," and has taken therefrom valuable ores, and appropriated them, and thus wasted the property of the Eureka Company, and done it irreparable damage: "that plaintiff still continues, by said work, and by this action and otherwise, to assert its adverse claim," and threatens to continue said work, etc.

Thus we have a cross-complaint, wherein the Eureka Hill Company claims to own and possess a lode, "the course, strike, and *apex* of which" are within the side lines of the Eureka, and yet the case tried was one the "course, strike, and apex" of which were not within said side lines, and the Eureka, *on the trial*, did not claim that the apex was "within the side lines" of the Eureka, but only that a part of it was so inside. Any one reading the cross-complaint would, it seems to me, necessarily conclude that the contest was for property claiming its apex wholly within the side lines of the Eureka claim, or at least where there was no material departure from such side lines. The language seems to have been chosen to impress this idea; for it is so guarded that it admits that "the hanging wall at one point and for a short distance," and that "a small and comparatively unimportant part" of the width of the lode, is westerly of and outside of the westerly surface side line of the Eureka mining claim, but that the main part of the vein in its width is in and has its apex in the said Eureka mining claim." It is true that it

is alleged that the "Eureka mining claim, and the lode
therein for its *entire width*, was located and appropriated
before the location of said Bullion claim, lot 76." But that
is a mere recital, referring to the lode already described as
having its *apex*, and the main part of its width, within the
side lines of the Eureka. The appellant was not notified
by the complaint that respondent proposed to claim any
other lode than such as it had described, or that the lode it
claimed had any other description or different boundaries
from that already described. If respondent intended to
claim a lode with different description, it should have said
so in the cross-complaint. The language of the cross-
complaint was misleading. If respondent intended to
claim a lode whose apex was not wholly, except an unim-
portant part, within the Eureka side lines, it would seem
to me that the language used was purposely misleading.
Had the claim set up at the trial, that respondent intended
to claim the lode on its apex clear across the Bullion ground
and far beyond, been set up in the cross-complaint, the
whole litigation as to the right of the respondent to go
outside its side lines, along the apex of the vein, could have
been disposed of on the demurrer, and the trial thereafter
confined to the question of identity of the lodes; and had it
not been disposed of, the appellant would have had full
notice of the claim to be set up by respondent. But no
such claim was intimated in the cross-complaint. It did
not claim the right to follow the ledge on the apex in any
direction outside of its side lines; nor did it claim the whole
ledge, except as being a ledge with its apex and strike
within the side lines of the Eureka. At the trial is the
first time that this claim of the right to follow the lode on
the apex heard of. The "hanging wall" is alleged to
have, "at one part and for a short distance," gone outside
of the westerly side line of the Eureka, yet on the trial this
"one part" and "short distance" lengthens out to the full
length of the whole 700 feet, and the "comparatively un-
important" departure from the side line of the Eureka
grows to the enormous proportion of embracing, length-
wise, the whole of about 700 feet of the northerly end of
the Bullion claim, and stretching clear across that claim

and far beyond. No hanging wall was found, and from the terms of the decree it would seem to be in the "unknown beyond," if it exists at all. If it was not found, the court could not say that it existed. Instead of the trial being in regard to a ledge the "main part" of which was in the side lines of the Eureka, it appears to have been in regard to a lode mainly outside of the Eureka lines. The decree allows the respondent all that part of the ledge which has its apex inside the Bullion side lines, and extends this allowance further to the west, into a claim not litigated in this case, and there stops in the midst of the apex, and arbitrarily establishes a line as the western limit of the Eureka Company's rights. This line is fixed, not at the hanging wall, for none is found, but at a point on the apex beyond which respondent waives his right. There is nothing in the pleading to justify or to warrant a decree to any of the lode beyond so much of it as had its apex within the side lines of the Eureka extended vertically downwards.

But we are told that this granting of about 700 feet long by 300 feet wide of the ledge, with its apex outside of the Eureka claim, is an immaterial variance, and does not prejudice appellant's rights. If a man be sued for possession of a 10-acre tract of land, with specified boundaries, it is not to be presumed that there can be judgment for a thousand acres with entirely different boundaries. The counsel for respondent says that this is like a contest over a horse. When the contest began the animal was a colt, but when decided it had grown to be a horse, yet it was the same animal. Was this ledge a small affair when this litigation began? and has it grown to its vast proportions since? It was small according to the pleadings, and is so yet, but not so as to the matter tried. Counsel also said that they did not know the vein was so large when they began the action. Then respondent is evidently getting something he did not sue for. I do not think that more ought to be granted than was sued for. If we were to take an admitted fact, the value of the mineral under so much of the apex of the ledge as is within the side lines of the Eureka claim is very great, probably worth hundreds of thousands of dollars. This and more is allowed to respondent under a

cross-complaint which claimed none of it.   It seems to me
that this is not an immaterial variance.   The cases referred
to to support the position of respondent do not go to such
an extent.   They extend mainly to the idea that an imma-
terial variance was such as did not affect the judgment, at
least appreciably.   But here the "variance" is the whole
bone of contention.   It is the whole subject of the trial
and the decree.   And this is in effect, admitted by respond-
ent, for it admits that the "wedge" is out of the case, and
that it is not claiming the ledge by reason of its being on
the dip of the Bullion ground.   What else, then, is there
left, except this variance to litigate?   Evidently nothing.
This variance was so great as to overshadow everything
else.   It is said that the pleadings might have been
amended; but they were not, nor was there any leave to
amend asked of the court.   Whether the respondent could
have amended is therefore not a subject for consideration,
as it was not asked.   Certain it is that the variance is so
extraordinary that, in my judgment, the decree should not
be allowed to stand, as it does not in any sense correspond
to the case made in the pleadings.

The decree likewise seems to fix boundaries, but nothing
of the kind was prayed for in the cross-complaint.

6. The respondent claimed on the trial that the Eureka
lode was very wide; its apex extending from the Montana
claim on the east through the Eureka claim, and on through
the Bullion claim, and far into another claim west of the
Bullion.   The width of the apex, for the 700 feet in con-
test, is not known, its hanging wall never having been
reached.

At common law the owner of land has title to all below
the surface, to the center of the earth.   If the title to a
tract of land is conveyed, we know that it means everything
within the boundaries extended vertically downwards to
any depth; and, without some statutory requirement or
qualification, the Eureka claim and the Bullion claim would
each embrace all that is within the side lines, and also end
lines, extending vertically downwards.   The uncertainty as
to what is conveyed by such claims arises upon the language
of the statute, and we are authorized to accept any change

or modification of the common-law rule, and adopt it; but, when the statute fails to make any modification or change, we fall back upon the common law to guide us to a correct conclusion.

The statutes of 1866 and 1872 have made one modification or change in the common-law rule, and only one. That change is to allow a departure from the side lines of a claim, on the dip of the vein. This is the sole modification, unless it be said that the language of the law of 1866, allowing all "dips, spurs, and variations," be a change; but that is, I believe, so universally admitted to mean the immaterial and trifling departures as not to be said to be a change of the rule. We approach the consideration of the question, then, with the common-law rule before us, with but one modification, and that having reference alone to the dip.

In the trial of the present suit it was not contended by respondents that the Eureka lode passed into the Bullion ground on the dip of the lode; but the whole contest has been and is that it departs on the apex from the Eureka claim, and on the apex it is claimed clear across the Bullion, and a hundred feet beyond, and yet the apex is not extended to the hanging wall. If the apex be so wide that it cannot be covered by the surface lines of these claims, so that a part of the apex is in one, and part of it in the other, and other parts still in other claims, it would seem to me to be a case not contemplated in the statute, nor by the legislators who framed the law. It is simply a case unprovided for by statute, and not within the terms of it. At the time of the passage of the law, such wide veins were rare, if known at all, in this country. If it be a case not provided for in the statute, it is the duty of the courts to apply the common-law rule, with a view, however, to carry out the spirit of the statute as far as possible. If the ledge were one of layers, with cleavage, the cleavage could be followed downwards; thus carrying out the spirit of the statute authorizing the miner to follow the ore on the dip. It is true that generally the dip is ascertained by the hanging wall; but where there is none, or at least none shown to exist, as in the present case, the following of the cleavage or layers would be the only way to approximate to

the rule of following the dip. But if there be no hanging wall, and no cleavage or layers in the lode, my judgment is that there is no possible course to pursue but to follow the common-law rule, and to give to each claim all that is within its side lines drawn vertically downwards. This is the only just rule, and when you pass beyond that you are at sea, without rudder or compass. But counsel for respondent say that, if we adopt such a rule in this case, we go contrary to the settled practice all over the coast. We heard similar appeals when the case of *Flagstaff* v. *Tarbet* was before us, and the question was as to the "swinging doctrine." But the swinging doctrine was nevertheless not good law, and the supreme court of the United States so declared in that case. But if the doctrine claimed by respondent be the ruling one on this coast, there should be some such ruling in the courts. I will refer to the cases to which we have been cited in support of this broad-vein theory.

In the case of *Golden Fleece Co.* v. *Cable Con. Co.*, 12 Nev. 312, which was a protest case, nothing of a brood-vein doctrine is taught, or even referred to in the opinion of the court. The only thing that could be styled a reference thereto is found in the language of Chief Justice Hawley in his concurring opinion. The chief justice was considering this old "swinging doctrine," which has been for a long time recognized by miners, and he still clung to so much of it as would allow the first locator to follow the strike of the vein outside of his side lines, so long as he did not go beyond the end lines extended in their own direction.

But this whole swinging doctrine has been considered exploded for years. The language of the statute itself, and the ruling of the United States supreme court in *Tarbet* v. *Flagstaff*, 98 U. S. 463, had settled it. The "swinging doctrine" was the whole subject treated upon in that last-named case. It is now referred to as supporting the broad-vein theory. I confess that I can see nothing in it of the kind. There was no question in it as to the vein passing out of the side lines otherwise than on the strike of the vein. There was no wide-vein theory in it, nor any wide vein. There was no widening of the vein so as to

pass out on the width of the vein on the apex. Some *dicta*
of the court are treated, however, as supporting the wide-
vein theory. These *dicta*, it will be seen, have no reference
to a widening of the vein, but to its passing out on the
strike; but, if read as regarding the wide-apex theory, it is,
to my mind, not comforting to those who hold to the
broad-apex doctrine. It says: "Slight deviations of the
outcropping lode from the location of the claim would
probably not affect the right of the locator to appropriate
the continuous vein; but if he should make a material de-
parture from his location, and run off in a different
direction, and not return to it, it certainly could not be said
that the location was on that vein or lode further than it
continued subsequently to correspond with it. Of what
use would a location be for any purpose of defining the
rights of the parties if it could be thus made to cover a lode
or vein which runs entirely away from it?"

The facts (if as claimed by respondent) in the case at
bar show us that the vein does depart on the width, on the
apex, and never returns again. It cannot be said to return,
when the decree of the court shows that it was not followed
even to the hanging wall. How much further it extended
is unknown, and till it becomes known there can be nothing
to show that it returned. There are two cases in Colorado
which decide squarely this question, and hold that where a
lode, as in those cases, departs from the apex into another
claim, and then bends and comes back to the claim from
which it started, the first locator had no right to that part
of the lode which passed on the apex into another claim.
*Wolfley* v. *Lebanon Min. Co.* ,4 Colo. 112; *Lebanon Min.
Co.* v. *Rogers*, 5 Pac. Rep. 661.

We are referred to the case of *Rose* v. *Richmond Co.*,
17 Nev. 25; but I have looked through that case in vain to
find support for the broad-apex theory, except that the
court decided the case upon the assumption that the first
locator takes the whole lode to its entire width. But this
assumption cannot be quoted as authority for the broad-
vein doctrine, for the reason that no issue was raised upon
the point, but counsel consented that the court should de-
cide the case without passing upon that point. This was

expressly stated by the court. There was no occasion for the court to examine the question, or decide upon it. When the case was affirmed in the United States supreme court, (114 U. S. 576,) we again find that no such doctrine is considered by the court, nor even any intimation that any such question was in the case.

We are next referred to the *Eureka-Richmond Case*, 4 Sawy, 302, in support of the respondent's position; but a careful examination of the case discloses that nothing of the kind was in issue in it. I am at a loss to know how this case could be considered a support to the broad-vein—broad-apex—theory. It supports the very opposite theory, if either. The statement of the case showed that the contest was over ore in the Potts deposit or chamber, and the court says: "The defendant claimed and worked that part of the chamber to the eastward of said line W X produced to C, whereupon the plaintiff, claiming that portion of the ore body as being *on the dip* of its portion of the lode, brought this action to recover the possession." Judge Field in delivering the opinion, in speaking of the line W X, said, further, "that the line thus designated, extended down in a direct line *along the dip* of the lode, would cut the Potts chamber, and give the ground in dispute to the plaintiff." The ore in the Potts chamber east of the said line is given to plaintiff because it is *on the dip* of plaintiff's ledge or lode. There is absolutely nothing in the case to aid the broad-vein·theory.

Our attention is called also to the case of *North Noonday Min. Co.* v. *Orient Min. Co.*, 6 Sawy. 299; S. C. 1 Fed. Rep. 522. There does not appear to be anything in the case that would call for a ruling upon the point in question; the vein discovered evidently being a narrow one. The court, however, makes use of this language in the charge, (and we have nothing of the case except the charge:) "But if you find that said vein or lode so cut by defendant is not one of the veins or lodes discovered within any claim, the title to which you find in the plaintiff, and that its apex or top is not within the side lines of any such claim of plaintiff, drawn vertically downwards, but is a separate, independent vein, *every part of which lies to* the

eastward or outside of and beyond any claim, the title to which you find to be in plaintiff, and *no part of the apex or top* of which is within the side lines of such claim drawn vertically downwards, then it does not belong to plaintiff." The term "no part of the apex or top" might be inferred to favor the idea of respondents if it were by itself, but the charge must be taken as a whole. In the very language quoted, the court says that if the jury find the vein in question to be "a separate, independent vein, *every part of which* lies to the eastward or outside of and beyond any claim" of the plaintiff, and "no part of its apex" is within plaintiff's lines, it certainly does not belong to plaintiff. But it is evident from a prior part of the charge that the court did not think it would belong to plaintiff even if a part of its apex was within its side lines, for the court says that the inquiry for the jury was "whether the vein or lode in question * * * is one of the veins or lodes discovered in any of the claims, the right, title, and possession to which you find to be in the plaintiff as against defendant; and, if you find it is one of such veins or lodes, or if you find that it is not one of these lodes, but that it has *its apex or top within the side lines* of any such claim, the title and possession to which you so find to be in the plaintiff, *drawn vertically downwards*, then, in either case, it belongs to the plaintiff." These sentences, taken together, show that the court had no idea of saying that the vein would belong to plaintiff in that action if any part of the apex was within his side lines "drawn vertically downwards." No question appears to have been in the case relative to a broad apex extending from one claim to another.

The case of *Jupiter Min. Co. v. Bodie Con. Min. Co.*, 7 Sawy, 96, S. C. 11 Fed. Rep. 666, was, like the last preceding case, an action in the nature of trespass, and as in the last case, all we have of it is the charge of the court to the jury. The court several times quotes the language of the statute as to the apex, but nowhere says anything as to an apex extending in width from one claim to another. The question of the rights of conflicting claimants to an apex which is on the width, partly in one claim and partly

in another, does not arise. That case is not more a support to the wide apex theory than the statute, and the statute says nothing whatever upon the subject.

In the case of the *Iron Silver Min. Co.* v. *Cheesman,* 116 U. S. 530, the question was as to whether the place below the surface, where the work was being done, belonged to the vein of one party or to that of the other. The court, after quoting the statute, says: "It is obvious that the vein, lode, or ledge, of which the locator may have the exclusive right of possession and enjoyment, is one whose *apex* is found *inside* of the surface lines entended vertically; and this right follows such vein, though in extending '*downwards*' it may depart from a perpendicular and extend laterally outside of the vertical lines of such surface location." The same case, reported in 2 McCrary, 191, and 8 Fed. Rep. 297, shows clearly that the court was dealing with the right of a locator to follow his lode *on the dip.* If there be anything in the case bearing upon the question at issue as to a broad vein, it is against the broad-vein theory, for the court recognizes the right of a locator to follow his vein only in its "*extending downwards.*"

And the same may be said regarding all of the cases cited by respondent in support of the broad-apex theory. Not a solitary reported case has been shown where the question has been decided in favor of the broad-vein theory. In only one could it have been decided, and that was the case of *Rose* v. *Richmond,* 17 Nev. 25, and really it could not well have been decided in that case, for the reason that the parties waived it, and consented that the case should be decided without deciding that question. Such a case can no more be quoted as authority on this question than the case of *Cannon* v. *U. S.,* 116 U. S. 55, appealed from this territory, can be quoted on the question of the jurisdiction of that court in such cases. The question was not raised, either by the parties or by the court, and hence could not have been decided.

If there were existing any reported case that would support the broad-vein doctrine, I have no doubt it would have been found, judging from the fact the interest of the respondent—like the interests of appellant—were in the

hands of able counsel, who worked for months in court on this case, to say nothing of the vast work necessary outside the court-room. It is said that one case decided at *nisi prius*, in Montana, favors the broad-vein theory, yet it is said to be offset by a *nisi prius* decision to the contrary in Arizona. Neither of the cases are furnished us, and we do not know what language was used by the court in either case. Neither of the cases are reported, nor have they reached the supreme courts in the respective territories.

We find that in some of the highest courts of the land the broad-vein theory has been positively repudiated.

In the case of *Hall* v. *Equator M. & S. Co.*, in the circuit court of the United States, we find the court, speaking by Judge Hallett, holding squarely against the broad-vein theory, and in favor of the doctrine that where a claim is located, and does not cover the whole width of the ledge, the locator cannot follow such lode outside the side lines, on the apex. The text of the opinion is furnished us in pamphlet. The court says: "As to all of the disputed ground, the principal question affecting the whole lode is whether, by locating a part of the width of outcrop, the whole may be taken." The claim in question in that case was, as were the claims in the case at bar, located under the law of 1866. The court further says: "If the law is illiberal, it is not for that reason the less controlling. If, however, a right to the entire lode cannot be asserted under a location covering a part only of its width, as seems to be obvious, the location may be valid for the part described in it. If it is on the top of the lode, it is within the act, and so it ought to be good for the part within the lines extending downwards vertically, if for no more." And further speaking of the locator's right to go out of his side lines, the court says: "For as to his right to go into other territory, he can only do so in pursuit of a lode or vein that *has its top or apex wholly on his ground;* and, having but a part of the lode in his territory, he cannot comply with that condition. *This appears to be a clear inference from the language of the act.* The right given relates to veins, lodes, or ledges

the tops of which are inside the surface lines, which obviously means the whole, and not a part. If, then, two or more collateral locations be made on one and the same vein, and the vein appears to be homogeneous throughout its width, we are authorized to say that each shall be confined within its own lines drawn down vertically."

There was a second trial of the same case, and Judge Miller, of the supreme court of the United States, charged the jury "that there is introduced, both by plaintiffs and defendant, evidence tending to prove that the claims of both parties are located on the same vein or lode of mineral-bearing rock in place, the general apex or upper surface of which is about 100 feet wide. If the jury believe this to be true, then I instruct you, as the law of this case, that the plaintiffs having the prior title from the United States to that portion of this lode within the lines of their patent, extended vertically downwards to the earth's center and the defendants having contested plaintiff's right to run a patent on the parts of the lode in controversy in the court of the territory, according to the act of Congress on that subject, and failed in that contest, and having accepted and read in evidence a patent for their own claim, which expressly excepts out of its territory claimed the interfering part in plaintiffs' said patent, the law of the case is for the plaintiffs, and they are entitled to all the mineral found within the side lines of their patent, extended vertically downwards."

Judge Miller, again, in *Stevens* v. *Williams*, 1 McCrary, 480, says, in his charge to the jury: "The plaintiff is not bound to lay his side lines perfectly parallel with the course or strike of the lode so as to cover it exactly.   *   *   * But if he happens to strike out diagonally *as far as his side lines include the apex*, so far he can pursue it laterally."

The supreme court of Nevada, in the *Golden Fleece Case*, 12 Nev. 329, heretofore referred to, says, in speaking of the United States mining statute: "Under that law it cannot be doubted that it [plaintiff] is bound by the lines of its surface claim in favor of a subsequent locator. It is true that the vein is the principal thing, and the surface

is but an incident thereto; but it is also true that the mining law has provided no means of locating a vein except by defining a surface claim, including the croppings or point at which the vein is exposed; and the part of the vein located is *determined by reference to the lines of the surface claim.* Those lines are fixed by the monuments on the ground, and they *cannot be changed so as to interfere with other claims subsequently located."*

The supreme court of the United States clearly supports the view that a locator is bound by his side lines vertically drawn downwards, and that he can depart from his side lines *only on the dip* of the vein.

In the case of *Iron Silver Min. Co.* v. *Elgin M. & S. Co.*, 118 U. S., 196, decided at the October term, 1885, of the supreme court of the United States, that court, speaking through Judge Field, says: "A section of the lode within vertical planes drawn downwards through the lines marked on the surface was *designed as the grant* to the original locator, but as the vein in its *downward course* might deviate from the perpendicular, and pass out of the side lines, the right was conferred to follow it outside of them." In the case at bar there is no claim that the Eureka lode passed out of its westerly side line *on the dip*, therefore there was no way for it to be followed out of the side lines. "The lines marked on the surface were designed as the grant," and it was confined to said surface lines drawn vertically downwards. But that court is still more emphatic when it says, through Judge Field, in the same case: "The surface side lines extended downwards vertically determine the extent of the claim, *except when in its descent* the vein passes outside of them." And in speaking of the locations not being made to fit the veins, the court says: "The remedy must be found, *until the statute is changed,* in carefully making the location, and *postponing the marking of its boundaries* until explorations can be made to ascertain as near as possible the course and direction of the vein." And, further, the court says, speaking by the same judge in the same case: "Even then, with all the care possible, the end lines marked on the surface will often vary greatly from a right angle to the true

course of the vein. But, whatever inconvenience or hardship may thus happen, *it is better that the boundary planes should be definitely determined by the lines of the surface location than that they should be subject to perpetual readjustment according to subterranean developments made by mine workings. Such readjustment at every discovery of a change in the course of the vein would create great uncertainty in title to mining claims. The rule, whatever hardship it may work in particular cases, should be settled,* and thus prevent, as far as practicable, such uncertainty." And the court, again, in speaking of end lines—and the same reasoning applies to side lines—says: "If the first locator will not or cannot make the explorations necessary to ascertain the true course of the vein, and draws his end lines ignorantly, *he must bear the consequences.* He can only assert a lateral right to so much of his vein as lies between vertical planes drawn through those lines. Junior locators will not be prejudiced thereby, though subsequent explorations may show that he erred in his location."

In the case from which we have just quoted, the supreme court of the United States emphasizes its language by ruling that the first locator cannot follow his vein outside of his side lines, *even on* the dip of the vein, when that dip is not within the parallel end lines, produced or extended in their own direction. That court thus holds that the statute, wherever it changes the common-law rule, must be strictly construed, and that nothing outside of the common-law limits is given unless it is granted in express terms.

Thus we have the plain letter the statute held to mean what it in express language says, and nothing is to be taken by inference. I think that the authorities I have quoted, together with the words of the statute itself, settle clearly that a locator of a claim on mineral land cannot follow his ledge outside of his side lines, except on the dip, and that, therefore, the claim set up by respondent of its right to follow its lode on the apex outside of its side lines is untenable. See, also, *McCormick* v. *Varnes,* 2 Utah, 355.

Aside from the authorities, there is another view of this question, which I think would show that the claim of a right to follow the lode on the apex outside of the side lines cannot be upheld. This claim of right set up by respondent as the basis of the decree is, in my judgment, inconsistent with the statute itself in another way. If it be assumed that the Eureka Company has the right to follow the lode on its apex outside of the Eureka side lines, and to within the Bullion side lines and beyond. and that the apex all the way across the Bullion claim should all *be at the surface*, as it is at the various points within the Eureka side lines, to whom would the apex belong within the Bullion ground? The Eureka Company claims that it has the right to follow its apex, and have all below the apex; and, on the other hand, the statute says that the Bullion Company shall have all of its surface ground. There is no dispute about the right of the Bullion Company to the surface ground, and the respondent has been especially careful to several times call the court's attention to the fact that it (the repondent) does not claim the Bullion surface, but admits that it belongs to the Bullion Company. But the claim of the respondent to the whole apex and the language of the statute, cannot both stand, when the apex might happen to reach the surface. Either the claim of the respondent must give way, or the statute must give way. Which shall it be?

It may be answered that the apex does not come to the surface; but, suppose it did, would the argument be in any manner different? If the Eureka Company has the right to follow the lode on its apex, and be entitled to the whole apex, is this right changed by the apex coming to the surface? If the Eureka Company be entitled to the apex to its full width, there does not seem to be any reason why it should be denied this right because the apex comes to the surface; and, if it has such apex, it has the surface of the Bullion as well as the under ground. The argument of the respondent leads inevitably to this conclusion. But if the statute, instead of the position of the respondent as to the apex, be upheld, and the surface be given to the owner of the Bullion claim, what becomes of the doc-

trine that the Eureka Company has the right to follow
the lode on its apex outside of its side lines, and to the
full width of the apex? If, then, the Eureka Company
should not have the surface, where will the separation
line be drawn between the Eureka and Bullion claims?
If the Eureka Company has all the ledge beneath the
surface, how much below the surface will its claim begin?
Will it be an inch, or a foot, or a thousand feet? By
what rule will we decide the matter? Are we not com-
pletely at sea? Yet to my mind this is the logical re-
sult of the argument, and the result proves the argu-
ment unsound. The only rule is to follow the lode on its
dip, as specified in the statute. That gives us a plain and
clean line of division; and, if there be a case where this
cannot be done, by a discovery of the hanging wall, the
nearest approach to it is to approximate the matter, and
to follow the cleavage or general direction of the ledge
downwards; and, if that cannot be done, the common-law
rule must control, fixing each locator's limit by his surface
boundaries extended vertically downwards.

7. I am of the opinion that the respondent was estopped
from claiming any part of the lode or lodes, the apex of
which parts was within the surface boundaries of the
Bullion claim 76, extended vertically downwards.

In *O'Reilly* v. *Campbell*, 116 U. S., 418, where a locator
in his notice gave a certain direction to his claim, and an-
other party made a subsequent location not in such direc-
tion, and worked upon it for three years, without objection
of first locator, the United States supreme court said: "We
do not think that the first claimants, under these circum-
stances, can appropriate the second claim. It is true, the
locators of the Omaha claim *intended to take the vein or
lode, and were ignorant of its true direction. But it was
incumbent upon them to make and ascertain its true
course, and indicate it in some public and visible man-
ner, so that others might not be excluded from explora-
tions on adjacent ground, or be deprived of the benefit
of their labor.* It is a rule among miners on the public
lands, so often brought to our attention, and so often de-
clared, that we may speak of it as a part of our judicial

knowledge, that discovery and appropriation are the source of title to mining claims, and that development of working is the condition of their continued possession. *Jennison* v. *Kirk,* 98 U. S., 453-457; *Jackson* v. *Roby,* 109 U. S., 440. This was the rule before Congress, by its legislation, sanctioned it. Four years after the defendants had made their location the predecessors of the plaintiff took up the Highland Boy claim, and for three years they or their successors continuously worked and expended money upon it without objection from the defendants, or any indication from them to the public that their own Omaha claim was at all interfered with. *It was too late afterwards to raise the objection.*"

In the case at bar the respondent saw that the Bullion claim was located, and held, claimed, and worked for years and patented, also, under the belief that it did not interfere with the Eureka claim. Respondent knew the rules and regulations of the mining district where its claim was located; knew that all claims were located not exceeding 200 feet wide, and that each claim was by such rules declared to carry with it all mineral therein contained. For years respondent allowed appellant to work, develop at great expense, and possess this property. It also advertised to the world, years before, by a prospectus circulated through the country, that it did not claim the property. It claimed a lode designated as within its own claim. Even down to 1883 the president of the respondent company loaned appellant $20,000, and took a mortgage upon the Bullion, among other claims. In this case, as in the case of *O'Reilly* v. *Campbell,* it was too late, after so many years, to raise any objection to appellant's right to the lode.

8. In the decree the respondent is alloted a large body of the lode where the apex is in neither the Eureka nor in the Bullion claim, but is further west. Before this ground could be included in the decree it should have been within the pleadings, and the court could grant no decree for such large body of the lode until it found which was the earlier location. There is no finding whatever as to the title to this part of the lode, or as to

whether the West Bullion or the Eureka was the earlier. If the West Bullion were earlier than the Eureka, that claim (West Bullion) would, under the ruling of the court, take the whole ledge to its full width. This finding was a prerequisite to decision of the title by the decree.

9. The next question for consideration is whether there are two veins, or one broad vein, extending in its width, on its apex, clear through all of these claims. If there be a substantial conflict of evidence, the appellate court will not generally reverse the judgment for insufficiency of evidence. The preponderance of evidence against the finding of the lower court must be great and decided. I shall not say, therefore, that there was not evidence to support the finding of the lower court that there was but one vein, taking into view the opinions of experts; but, considering the case outside of the opinions of experts, I think the evidence strongly preponderates against the broad-vein theory.

Whether there is one vein or two veins should not be made to depend upon the opinion of experts alone, unless it should appear that the question involved matters which lie "beyond the scope of the observation, knowledge, and experience of men in general." *Jefferson Ins. Co.* v. *Cotheal*, 7 Wend. 72, 78. Such opinions can be of no great weight, unless they "are to be deduced from facts that are not disputed, or, at least, from facts that are in evidence before the jury:" 1 Phil. Ev. *778; 1 Greenl. Ev. sec. 440, p. 605. I am, and have for a long while been, of the opinion that in mining suits generally too much weight is given to the opinion of experts, and not enough to the facts proven.

The question before a Massachusetts court was as to whether two pieces of wood were parts of the same stick of natural growth. The opinions of workers in wood were admitted to prove it (*Com.* v. *Choate*, 105 Mass. 456); but such opinions would have been of very little weight had there been witnesses present to testify that they saw one piece cut from a growing tree in Canada and saw the other piece cut from a growing tree in Florida. The facts thus proven would have outweighed all mere opinions.

Aside from the opinions of the experts, the evidence in the case at bar seems to show two distinct outcroppings of ore-bearing rock for hundreds, if not thousands, of feet, appearing and then disappearing, and again reappearing, and extending northerly and southerly; but, where the croppings were beneath the surface, the same apparent distinction was kept up. The underground workings show that there are two vast bodies of ore extending northerly and southerly. From each of these vast lodes or ledges there are such fissures or breaks from east to west, and possibly such fissures or breaks reach sometimes across from one great ore body to the other; but these side fissures or off-shoots are all in the same country rock—limestone—that is to be found on each side of these veins, and in no instance that I remember is one of them shown to carry ore all the way. The limestone country rock fills the space between the great deposits, as it does the country around. It would seem to me to be more reasonable to call the Black Sea and the Mediterranean Sea one and the same body of water, because connected by a narrow strait, or to call the Mediterranean Sea and the Atlantic Ocean one and the same body of water because connected by the Straits of Gibraltar, or to call the Siamese twins one person because they have a fleshy connection, than to call these two great bodies of ore one and the same lode. They are two bodies—two lodes—with no ore connections.

A lode, said Judge Field, in the *Eureka Case*, 4 Sawy. 311, as the term is "used in the acts of Congress, is applicable to any zone or belt of mineralized rock lying within boundaries clearly separating it from the neighboring rock." And Judge Hallet, in *Stevens* v. *Williams*, 1 McCrary, 488, says: "In general, it may be said that a lode or vein is a body of mineral or mineral body of rock, within defined boundaries, in the general mass of the mountain." These definitions have been adopted by the supreme court of the United States in *Iron Silver Min. Co.* v. *Cheesman*, 116 U. S. 529.

The experts for the respondent do not seem to agree as to what the lode or zone in this case is. In one part of the

testimony we are led to believe that the shale-bed on the east is the east boundary of the lode, and at another place that the boundary must be further east than the shale-bed, and in another place that it is reached before we reach the shale-bed; and from other parts we are led to believe that the ore-bearing bodies of rock in the openings in the lime country rock are the lodes or lode. If the shale be the boundary on the east, there seems to be no reason why the shale-bed, about a thousand feet to the west, should not be the western boundary. Between the ore-bearing rock and the eastern shale-bed we find all the rock to be lime, and the same seems to be the case between the ore-bearing rock and the shale-bed on the west. But the lime, both on the east and west of the ore, is barren, and it cannot come within the definition of "lode" or "zone" given us above by the courts. The deposit, in order to be a "lode" or "ledge," within the meaning of the act of Congress, must be a "mineral-bearing rock." We must, therefore, throw out of consideration all the lime-beds outside of the shale-beds, and throw out the shale-beds, and also throw out the lime-beds inside the shale-beds, and narrow the true lode down to the great openings in the limestone, which are filled with quartz and lime, bearing silver and lead. All else is country rock. Dr. Hunt, a leading witness in the case, defined a "lode" as a "mass of mineralized rock in place, limited by non-mineralized rock;" and, when questioned further, he says that he does not bound the lode by definite walls, or boundaries, or limits, except by the material which is not impregnated. He had put to him a question as follows:

"*Question.* Then the lode, in your judgment, would widen as manufacture would enable parties to utilize a lower grade of ore?" and he made answer: "Very much so."

Such language might be good in geology, but it would leave out of view entirely the idea of a lode, as given by the courts. The law, as interpreted by the courts, and as I have quoted, requires that this "mineralized rock" must lie "within boundaries *clearly separating* it from the neighboring rock;" it must be within "well-defined boundaries." A shifting boundary, its position depend-

ing upon the price of lead or silver, cannot be adopted by the courts. It would play sad havoc in a decree. The requirements by law of Congress of "boundaries clearly separating" the mineral from the neighboring rock—the requirements of "well-defined boundaries"—will not allow the adoption of the rule of following the mineralization to an indefinite extent; but there must be some way of settling the question by boundaries clearly marked, and not indistinctly marked, by the shadings of mineralization, more or less distinct. There must be something more definite than fading mineralization. There must, of course, be mineralized rock of some kind; but the rock, and not the mineralization, must have clearly-defined boundaries, clean-cut limits—such limits as can be intelligibly understood in a decree or judgment of a court. The zone must be impregnated with ore, and not with the stains from ore; there must be something more substantial.

In this case the ledge or lode that was really located, was, I have no doubt, one of quartz, or other rock in place, carrying silver and other metals in limestone, and having limestone walls, and running northerly and southerly. There are two such veins, with lateral breaks, some of which may reach from one body to the other; but these breaks, although some of them carry ledge matter, do not carry ore. Such breaks, therefore, do not, as I take it, make these great ore bodies one ledge or lode, as contemplated in the act of Congress. One of these lodes does not go as a mass to the other, nor spread out to meet it, but the only connection was some slender drifts through ledge matter, without ore. The theory of the experts who find there is but one ledge is, in substance, that all these ore bodies in Eureka hill had a common origin, and are connected with some central line of deposits, and cannot be segregated as separate and independent veins in origin or character, but the whole must be taken together as a unit, and as one lode or zone. But, to my mind, by such a theory, all of the lodes in any particular section of country which were of a common origin and character belong to one mother lode, and cannot be separated from it as independent lodes. That may be a good theory in geology,

but I do not think that Congress had any such idea in view when it enacted the laws regarding mining claims. Congress had no idea of giving one man a whole mountain country; because, possibly, it may all have been thrown up at one time, or because the minerals came up at one time, and were of the same' general character. One lode may be connected with another, but that does not make them one and the same. Such a theory is too broad to fit any law of Congress ever yet enacted.

The opinions of the experts in the case are, however, divided as to whether there be one vein or two veins. But the broad-vein idea is, as I take it, based upon a theory not in accord with the act of Congress, and the opinions of some of the experts were formed upon very limited examinations of the works. For example, one of the most important witnesses spent but 10 or 12 hours in these labyrinths of underground workings, and examined but two levels. Still I deem his opinion very valuable, and given, as all others were, with the utmost candor and honesty. But I am not disposed to call in question the conclusion of the court on this point further than I have already stated.

Whether, however, we consider that there was one vein or two veins, the evidence will show that the ore body passes from the side lines of the Eureka claim on the strike of the ledge, and both veins pass on the northwest. It was the duty of respondent, if it claimed the lode in the Bullion ground, to have traced it out—made the necessary explorations. Such is the requirement of section 7 of the by-laws of the Tintic mining district, and such is the rule recognized in *O'Reilly* v. *Campbell*, 116 U. S. 418, and in *Cheesman* v. *Iron Co.*, 116 U. S., 529.

There are some other minor points upon which I cannot concur with the majority of the court, but it is not necessary for me now to detail them. The reasons which I have given are abundantly sufficient to show why it is impossible for me to concur with the majority of the court in the conclusion rendered by them. I think the judgment and decision of the court below should have been reversed.